John O. DOERGE, Plaintiff,

v.

NATIONAL BANK OF COMMERCE, Colwell Mortgage Trust, Harry J. McCaffrey, Jr., Trustee, Defendants.

Civ. A. No. CA–3–76–0003–G.

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 21, 1977.

Bill C. Hunter, Timothy J. Vineyard, Hunter, Stewart, Salzberger & Vineyard, P. C., Dallas, Tex., for plaintiff.

George H. Kolb, Wynne & Jaffe, Dallas, Tex., for NBC, Colwell & McCaffrey.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

### I.

### INTRODUCTION

This memorandum constitutes the court's findings of fact and conclusions of law under Rule 52 F.R.C.P. Jurisdiction over these conflicting claims to proceeds from the sale at foreclosure of Texas real estate exists by virtue of the diversity of the citizenship of the litigants. The litigants include John O. Doerge ("Doerge"), an investor from Cleveland, Ohio, the National Bank of Commerce ("NBC"), a national bank located in Dallas, Texas, Harry J. McCaffrey, Jr. ("McCaffrey"), NBC's Executive Vice President and Colwell Mortgage Trust, a real estate investment trust organized under the laws of the State of California ("Colwell").

Doerge is a 52-year old investor whose primary experience had been in the marketing of securities. For in excess of 20 years, Doerge was a partner in a securities firm holding a seat on the Midwest Stock Exchange. The firm was voluntarily liquidated in early 1972 resulting in an increase in taxable income to Doerge. Doerge then sought other investments which would both provide immediate substantial tax deductions to offset taxable income and thereafter produce income. Through Cleveland legal counsel, Doerge was introduced to Tom Hill of Dallas, Texas.

Tom Hill was engaged in the business of acquiring, developing and ultimately managing real estate property. At the time Doerge first met Hill, Hill had substantial assets. The December 31, 1971 financial statement of the Hill Companies, [1] under which time Hill did business, showed a net worth in excess of $7,000,000. NBC was one of Tom Hill's principal banks.

This suit concerns two tracts of land referred to as Charter Oaks I and Charter Oaks II (collectively as "Charter Oaks project"). In 1971, 144 apartment units had been constructed on Charter Oaks I and plans existed for the construction of Charter Oaks II, consisting of 144 units upon a contiguous tract. Before August, 1971, NBC acquired in foreclosure Charter Oaks I

---

1. Unless pertinent, Hill, Hill Companies and Hill Financial Corporation are used interchangeably in this memo. The actual borrower in March, 1972 and April, 1973 was Hill Financial Corporation, a "thousand dollar corporation".

and the undeveloped contiguous tract of Charter Oaks II.

On August 9, 1971, Hill purchased Charter Oaks I and II from NBC for $1,550,000, evidenced by promissory notes in the amounts of $1,250,000 and $300,000 and secured by vendor's liens upon Charter Oaks I and Charter Oaks II, respectively. (Plaintiff's Exhibits 1 through 7) Before NBC's sale to Hill, it had committed to make an interim construction loan in the amount of $1,250,000 and had advanced some $1,114,-858 under that commitment. That is, NBC had foreclosed upon the Charter Oaks project before its original interim construction loans were fully funded. Hill's note to NBC thus covered the advances made to the previous owner as well as accrued interest. The sales contract between Hill Financial Corporation and NBC (Plaintiff's Exhibit 7) also obligated NBC to lend a total sum of $435,141 for further construction. Hill in turn agreed to complete the construction in conformity with existing plans and to hold loan advances in trust for payment of construction costs and other related costs, including finance charges.

On October 28, 1971, Hill and Doerge entered into a contract of sale (Defendant's Exhibit 2). By its terms, Doerge approved ". . . the plans and specifications for construction of the improvements on the premises to be known as Charter Oaks Phase II and does hereby approve placing of a construction mortgage in the amount of $2,600,000 bearing interest at not more than 10% per annum for purposes of constructing the improvement as per the contract". Although by the contract, Doerge acknowledged receipt of a deed, no such deed was ever recorded and Doerge denies having received it. A separate written agreement between Doerge and Hill also dated October 28, 1971 and termed "closing agreement" further provided that Doerge waived ". . . receipt of a title policy insuring the interest in the premises (as improved) purchased by purchaser under the contract, until such time as the mortgage of a permanent financial institution shall be filed as of record . . ." (Defendant's Exhibit 2). Doerge paid $350,000

in cash at closing and executed a note payable to Hill in installments together aggregating the principal amount of $1,172,000.

The contract of sale between Doerge and Hill (Plaintiff's Exhibit 8) provided:

". . . Purchaser agrees to purchase the subject property subject to a first mortgage lien presently in the amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) on Phase I and Purchaser agrees to subordinate his title to a new construction loan mortgage up to an amount of Two Million Six Hundred Thousand Dollars ($2,600,000.00) secured by both Phase I and Phase II, the terms of the new construction loan mortgage to be approved in writing by Purchaser . . ." Plaintiff's Exhibit 8, p. 2, para. 2a.

Doerge and Hill agreed that Hill would complete the construction of Phase I and Phase II subject only to a lien in an amount not to exceed $2,600,000. Hill also undertook to assure permanent financing of the $2,600,000. Doerge agreed to subordinate his title to the permanent mortgage at the time of closing of the permanent mortgage.

The agreement also gave to Doerge a "put option" exercisable if the rent rolls of the completed project "indicates [sic] that the annualized rent as of October 31, 1974 is less than $622,771." By the put, Doerge could terminate his obligation to pay to Hill the balance of $761,000 which would then be due and instead deliver to Hill his Quitclaim Deed for an undivided one-half interest in the property. Simultaneously with the "closing" of the sale by Hill to Doerge, Doerge leased the Charter Oaks project to Hill.

In sum, as of October 28, 1971, Hill had agreed to obtain additional monies necessary for completion of the Charter Oaks project in an amount up to 2.6 million dollars. Hill in turn had undertaken to sell to Doerge the Charter Oaks project and simultaneously lease it back. Although the transaction was "closed", nothing was filed of record to evidence Doerge's ownership interest.

On February 22, 1972, Colwell executed a commitment for permanent financing which, after amendments of March 1 and March 2, 1972, was in the amount of $2,650,-000. On March 12, 1972, Hill Financial Corporation and NBC entered into a construction loan agreement (Plaintiff's Exhibit 13). NBC agreed to lend up to $2,560,000 to Hill Financial Corporation for the purpose of completing improvements on the project in conformity with plans and specifications of February, 1972. The debt was secured by deeds of trust upon Charter Oaks I and II. NBC in turn enjoyed the obligation of Colwell to purchase NBC's interest in the project upon specified terms and conditions.

Thus by March 14, 1972, the Charter Oaks had proceeded substantially as contemplated in the contract of sale between Doerge and Hill. That is, Hill had obtained the requisite additional financing, both interim and permanent, in amounts less than the $2,600,000 and was undertaking to complete construction of Phase I and Phase II. The only rub is that there is no evidence that the terms and conditions of the new deeds of trust were approved by Doerge. At the same time, there is nothing to suggest that at least through March 14 that Hill was giving Doerge anything other than what Doerge had contracted for. Significantly, as discussed below, there is no evidence of any objection by Doerge despite the fact that he had to have known that a lender was advancing money to complete the project.

In April, 1973, the March, 1972 agreements were amended and the indebtedness was increased to approximately $3,000,000. There is nothing to suggest that Doerge was aware of this increase in debt.

On October 29, 1974, Doerge, through his counsel, advised Hill that at the end of October, 1974, his put would be exercised. (Plaintiff's Exhibit 45). On November 4, 1974, Hill Financial Corporation executed a warranty deed conveying one-half interest in the Charter Oaks project to Doerge. (Plaintiff's Exhibit 46). However, Doerge denies that he authorized execution of the November 4 deed or that he even knew that it was executed.

Doerge in 1972 took all tax advantages afforded by 100% ownership of Charter Oaks I and II including prepayment of interest as then authorized under the tax laws. Doerge continued through the month of October, 1974 to treat for tax purposes the project as owned in its entirety by him. Thereafter, Doerge's position for purpose of federal income taxes was that he owned only one-half of Charter Oaks I and II. That is, for the taxable year 1974, Doerge took 100% of the available tax advantages through the months of October and for the months of November and December only 50%. Although Doerge claims that his exercise of the put option was ineffective, he has no explanation for treating them as effective for tax purposes.

On August 5, 1975, NBC purchased Charter Oaks I and II at foreclosure, bidding its debt in the amount of $3,078,471.

## II.

### CLAIMS AND CONTENTIONS OF THE PARTIES

Neither the manner of conducting nor the fairness of the return from the foreclosure sale are questioned. Instead, Doerge claims that he is entitled to all proceeds of the 1975 foreclosure sale in excess of the $1,172,000 indebtedness to which the property was subject when he contracted to purchase it in October, 1971. This follows, Doerge claims, from the circumstance that NBC is chargeable in law with knowledge of his ownership interest and that the March, 1972 and April, 1973 increases in debt purportedly secured by Charter Oaks I and II cannot prime his rights. Central to this position is the subsidiary assertion that Doerge, at the time of the August, 1975 foreclosure, had a 100% ownership interest. If Doerge's October, 1974 attempt to exercise his option was successful, the proceeds of foreclosure would not exceed the debt to which his one-half was concededly subject. Finally, Doerge asserts that if his lien rights are subordinate to NBC's additional

advances, he has standing to question NBC's interest charges, assertively usurious.

NBC denies possession of sufficient information to charge it with notice of Doerge's ownership interest at the time of either the March, 1972 or April, 1973 increases in debts. Alternatively, NBC argues that if chargeable with notice, Doerge is estopped to deny the superiority of NBC's lien position. This estoppel flows from the circumstance that Doerge deliberately withheld the recordation, or other public disclosure of his ownership interest to avoid jeopardy to the ultimately successful effort to obtain financing for completion of the Charter Oaks project.

NBC points to the circumstance that Doerge from the outset contemplated completion of Phase II with financing acquired in precisely the same manner it was in fact acquired. These facts coupled with the additional fact that all of the additional advances by NBC went into the Charter Oaks project result in an equitable subordination of Doerge's interest to NBC's liens. Finally, NBC denies that its loans were usurious or that Doerge has standing to so question them.

### III.

### ISSUES

1. *Notice to NBC before March, 1972.*

The Texas Supreme Court in *Hexter v. Pratt*, 10 S.W.2d 692 (Tex.Com.App.1928) stated the legal measure of notice.

"In common parlance 'actual notice' generally consists in express information of a fact, but in law the term is more comprehensive. *In law whatever fairly puts a person on inquiry is sufficient notice, when the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained.* Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. So

that, *in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of the information at hand would have disclosed.*" (at 693) (Emphasis added).

Under Texas law, actual notice and implied notice of a fact have the same legal consequence.

". . . But, the rule of implied notice of a fact which could be discovered by inquiry is not applicable unless the party who is sought to be charged with such notice is under a duty to follow up the communication by inquiry." *Exxon Corp. v. Raetzer*, 533 S.W.2d 842, 846 (Tex.Civ. App.1976).

Otherwise stated, Doerge had the burden of showing either that the bank had actual knowledge of Doerge's interest or acting as a reasonably prudent lender under all the facts and circumstances here possessed sufficient facts to have placed upon it a duty of inquiry, which would have led to that discovery.

Doerge points to two documents in the possession of NBC before March, 1972 which he contends constitute notice to NBC under Texas law of his ownership interest. The first document is a financial statement of Tom Hill dated December 31, 1971, received by NBC on February 22, 1972. By February 22, 1972, substantial discussions which ultimately led to the March loan and buy-sell agreement among Hill, Colwell and NBC had already occurred. In fact, Colwell's loan commitment was dated February 22, 1972.

The financial statement went to McCaffrey, the loan officer, and then to the credit department for a "spread". McCaffrey asserted that he reviewed the statement for the purpose of gaining a general picture of Hill's financial posture because Hill was to be a guarantor of the proposed construction loan. He denied having learned from his examination of any outstanding interest owned by Doerge in Charter Oaks. The

statement was examined by the credit department with the purpose of attempting to find any potential financial weakness in Hill's financial structure and without regard to the proposed loan transaction itself. In other words, the credit department follows a predetermined analytical structure reflected in an NBC form to review the financial strength of a proposed borrower. While there is some question, Doerge failed to prove that the financial statement itself was sent to the actual loan committee which approved the transaction.

The financial statement in its notes reveals that Doerge had an ownership interest in Charter Oaks. Colwell and NBC obtained title binders and otherwise obtained the usual assurances of title company that record title in Hill was at least sufficient to support the security interest Hill granted to NBC and Colwell. There is little question but that no one in NBC or Colwell focused upon any interest of Doerge, a person unknown to either NBC or Colwell.

The second instrument Doerge points to is that of an October 26, 1971 Dunn and Bradstreet Report which shows that "Hill operates residential and non-residential buildings". The later statement reveals nothing pertinent.

NBC and Colwell had no incentive to not learn of any ownership interest of Doerge. The very claim being asserted in this suit demonstrates that ignoring such interest could be foolhardy indeed and experienced bankers in Dallas, Texas, are not naive if indeed they are anywhere. The difficulty is that a financial statement is not the usual, or typical source of information as to ownership claims. The lending officer is not necessarily trained to read a financial statement in a detailed way sufficient to make final decisions as to credit worthiness. Regardless, NBC looks to its credit department for its analysis of a statement. It was the traditional title examination that NBC and Colwell looked to for assurance as to property ownership.

Examination of the financial statement with the 20/20 vision of hindsight makes clear that NBC might have learned of Doerge's claimed interest by scrutiny of the statement. But as stated in *Exxon Corp. v. Raetzer, supra,* the question was whether the circumstances were such "that may merely arouse suspicion in the mind of a reasonably prudent person" or whether they are ". . . fairly suggested by the facts really known." The inquiry is not the simplistic one of what we know now. It is the more difficult inquiry of the knowledge a reasonably prudent banker is chargeable with under all these facts and circumstances. This judgment cannot be made in a vacuum but must be made against a background of the usual lending practices of these commercial institutions. That is, a reasonably prudent standard takes measures from actual banking practices. Against these standards, it becomes apparent that NBC is not chargeable with knowledge of Doerge's interest at the time of its loan commitment of March, 1972. That this result is reflective of reasonableness is demonstrated by a consideration of any other result. A lending institution in receipt of a financial statement would henceforth be compelled to review that statement for any revelations regarding defects of title upon any property upon which a security interest may be taken. Its utilization of title searches and reliance upon recordation requirements would be substantially undercut. Most title policies except from coverage any defect known to the insured. That is not to say that present banking or title insuring practices ought to be preserved. It is to say that the reality of lending practices as testified to by McCaffrey are facts for determining whether there were circumstances that merely arouse suspicion in the minds of a relatively prudent person or whether there was more.

■ It is no answer to argue that because the December 31, 1971 financial statement contained a direct disclosure of Doerge's interest no inquiry of reasonableness ought to be made. It is no answer because containing and imparting information are different ideas. With no incentive to proceed and every reason not to proceed if a title defect is suspected, and with noth-

ing to refute the credible denials of awareness by the officer in charge of the transaction, it taxes the imagination to believe the bank officers were actually aware of Doerge's interest. Accordingly, the inquiry is whether NBC is to be *charged* with notice and this inquiry is of a reasonably prudent banker. Here the explicit communications of the footnotes when stood against the background of reasonableness of practices becomes inexplicit to say the least. It is just not unreasonable for a prudent banker preparing to commit his institution to a multi-million dollar loan transaction albeit routine in structure, and knowing that the loan will not close unless an insured title is obtained and his regular bank counsel have approved it, to fail to learn of an adverse claim to real estate found in the footnotes of a financial statement. The factual question is a close one but it was Doerge who bore the risk of non-persuasion. It is the judgment of the court that Doerge has failed in this burden.

### 2. *The Exercise of the Option* :

Doerge claims to have owned 100% of the Charter Oaks project when NBC purchased it at foreclosure in August, 1975. Doerge makes this assertion despite the fact that he gave notice in October, 1974 of intent to exercise his option at the end of October and despite the fact that for tax purposes (a very important purpose in Doerge's mind) he thereafter treated the property as only one-half his. Moreover, Doerge also must face the fact that coincidental with his reducing by one-half his tax claims and attempting to exercise his option, an undivided one-half interest in Charter Oaks I and II was quitclaimed to him. Keeping in mind that Doerge never received a deed for the 100%, the November, 1974 conveyance is consistent with an effort to adjust record ownership to correctly reflect the ownership interest. Finally, Doerge faces the problem of having claimed in other litigation that he did effectively exercise the option. Doerge's only substantial argument to support the claim that he did not exercise the option is that Hill was unable to return Doerge's note, having pledged it to another

bank. The October 28, 1971 contract between Hill and Doerge provided "purchaser, at his option, may terminate his obligation to pay to seller . . ." There is no proof that Doerge has not effectively cancelled that debt. While the pledgee of the note is attempting to enforce it that pledgee took it subject to Doerge's defenses against Hill.

### 3. *The Estoppel Question.*

Doerge's claim contains a number of inconsistencies. When stripped of legal garb, it is simply this. Doerge contracted to purchase apartment projects which were partially completed agreeing to subordinate his ownership interests to loans sufficient to complete the projects up to 2.6 million dollars. Hill was to procure that financing for which he also was to receive a fee. Doerge could not borrow those monies because a loan to him would exceed the legal limit. No lender would advance the costs of construction without a lien superior to Doerge's interests. Thus it was critical to the entire transaction from the outset that the March, 1972 transactions occur precisely as they did occur save for the express approval of Doerge of the terms and conditions of the loan. That is Doerge can hardly point to the March loan transactions as constituting a material breach by Hill of the agreement between Hill and Doerge.

Doerge knew that the additional construction had been completed. Indeed, the very option he attempted to assert utilizes rent rolls and income figures from both Phase I and Phase II. It is simply inconceivable that Doerge would not know that additional funding had been obtained. This places Doerge in the position of either assuming, as his contract provided, that his interest was subordinate to a lending institution or that Hill was furnishing the financing without further encumbrance upon the property. Having allowed NBC to rely upon the supposition that its loan was secured by a lien superior to Doerge's, Doerge is estopped to deny otherwise.

Doerge's claim faces another hurdle. If as Doerge asserts NBC is chargeable with having been aware of his interest in the Charter Oaks properties when the March,

1972 loan transactions were completed, is the court to impute to the bank the full range of facts which the resulting duty of inquiry would have revealed? What would have been revealed, of course, is that Doerge had agreed to subordinate his interest in the loan as consummated. Doerge's claim is perforce not that NBC had a duty of inquiry which if discharged would have revealed only a part and not all of his contract.

Alternative to the findings of this court that Doerge did not own 100% of the property at the time of foreclosure and that he is estopped to deny superiority of NBC's liens is that NBC, by Doerge's own claim, is a third party beneficiary of the agreement to subordinate. While NBC's claim of agreement to subordinate would be subject to defenses Doerge would have had against Hill as otherwise pointed out, no material breach has been suggested.

## IV.

### USURY CLAIMS

 The beginning and the end of Doerge's claim that NBC and Colwell have charged an illegal rate of interest is that Doerge was never charged such interest nor obligated to pay it. His able counsel have attempted to place NBC and Colwell upon the horns of a dilemma. The argument is that finding Doerge's interest to be subordinate to NBC's and Colwell's is an implicit finding of agency between Doerge and Hill. Unquestionably, Doerge did appoint Hill as an agent to procure additional financing for completion of the Charter Oaks project. Doerge's interest in the Charter Oaks project not only was to be subordinate to the interest of lenders obtained by Hill, Doerge exacted a stipulation that he would not be personally liable for such debts. The absence of personal liability negates any inference that Doerge was "charged" interest by NBC and Colwell by virtue of his property interest being charged with the liens. No question of standing in the Arti-

cle III constitutional sense is presented. The question instead turns on the usury laws of the State of Texas. Doerge was here one step removed from that of a guarantor. *See, e. g. Universal Metals and Machinery v. Bohart,* 539 S.W.2d 874 (Tex.Sup. 1976). Doerge is one step removed because only his property was subject to the debt and that exposure was secondary. The usury claim is without merit.

### CONCLUSION

The court has held that Colwell's and NBC's liens securing the March, 1972 loan was superior to Doerge's ownership interest, because (1) NBC was not chargeable with notice of Doerge's interest when it committed to lend in March, 1972, and (2) Doerge was in any event estopped to deny the superiority of NBC's liens at the time of foreclosure.[2] Finally, the court has concluded that Doerge owned only one-half of the property when NBC foreclosed and no usury claims were made out.

---

2. It is not necessary to deal with the April, 1973 loan transaction because the unpaid balance of the March, 1972 loan with interest (even at rates less than charged and unquestionably legal) exceeded the successful bid at foreclosure. Nor can one argue that with the passage of time, NBC learned enough to be chargeable with notice before it had advanced that sum sufficient, when added to unpaid interest, to equal the sum bid at foreclosure.