**Jerald TURBOFF, Harold Turboff, and Ronald Turboff, Appellants,**

v.

**GERTNER, ARON & LEDET INVESTMENTS, et al., Appellees.**

No. 13-91-273-CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1992.

Rehearing Overruled Oct. 8, 1992.

Richard Haynes, Michael M. Essmyer, Roger Townsend, Frank G. Jones, William J. Boyce, Clinard J. Hanby, Sarah B. Duncan, Houston, Mark G. Yudof, Austin, for appellants.

Don Fogel, Tom Alexander, Lynne Liberato, Houston, for appellees.

Before NYE, C.J., and KENNEDY, and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

NYE, Chief Justice.

This is an appeal from a judgment entered in favor of appellees Gertner, Aaron and Ledet Investments (GAL) and against appellants Jerald Turboff, Ronald Turboff and Harold Turboff (Turboffs) in a contract action involving the financing and sale of real estate. The Turboffs claim on appeal that the trial court erred in determining that performance of their promise to purchase under a buy/sell agreement was not conditioned upon GAL's conveying the property subject to existing financing. The Turboffs also claim that the trial court's damage findings improperly bestowed a windfall upon GAL.

The Turboffs, Jerome Hutchins, Guy Hutchins and Frank Romero owned Gemcraft Inc., a construction company. Gemcraft owned Great Western Development Company, a land development company. Gemcraft had a cash flow problem in 1984. In order to improve the situation, the Turboffs decided to sell some property southwest of Houston called the Arcola Property. Jerald Turboff contacted Don Aaron of GAL to propose the sale of the property to GAL. Don Aaron and the Turboffs had a close relationship, both personal and business. Through this transaction, GAL obtained a 27.55 million dollar loan from First Texas Savings Association (First Texas) to purchase and develop the land and provided a personal guaranty for the top 20%, bought the Arcola property, entered into an additional contract for the future sale of residential lots to Gemcraft and entered into a management agreement with Great Western under which Great Western would develop the property for GAL.

In closing the transaction, the parties [1] also entered into a buy/sell agreement which is central to this litigation. Through the buy/sell, the parties to the agreement were each entitled to terminate the deal. The terms used in the agreement to describe the options are "put" and "call". The Turboffs, under the agreement, could exercise the call, which would allow them to reacquire the property. Likewise, under the agreement, GAL could exercise the put, by which the property would be returned to the Turboffs. Upon exercise of either a "put" or "call", the six individuals who signed agreed to pay GAL a fee based upon a structure set forth in section 4 of the agreement and will be called "the section 4 fee" throughout this opinion.

If the development was successful, the Turboffs could take advantage of the success and reacquire the property. They

[1]. The parties to the buy/sell agreement were the Turboffs, Jerome Hutchins, Guy Hutchins, Frank Romero and GAL.

could exercise the "call", pay the section 4 fee, reimburse GAL for the management fee payments, pay a participation interest and force GAL to return the property to them. If the deal was unsuccessful, GAL could return the property to the Turboffs by exercising its "put". In the event GAL exercised the "put", the Turboffs would accept conveyance of the property, reimburse GAL for management expenses, service GAL's debt to First Texas, and pay the section 4 fee.

Section 16 of the buy/sell contained language that First Texas executed the agreement to evidence its consent to the matters contained therein. The agreement provided a block for First Texas to sign.

In September 1984, the transaction closed. First Texas never signed the buy/sell agreement. There was conflicting evidence concerning whether the Turboffs were aware that First Texas had not agreed to the transfer of financing prior to the time the deal closed.

At some point after the transaction closed, GAL became concerned about the lack of development on the property. On December 14, 1985, GAL exercised its "put". Because First Texas had not agreed to transfer the financing and because the Turboffs had not obtained other financing, the sale back to the Turboffs did not occur.

Thereafter, GAL filed suit in May 1986, against everyone in the transaction except First Texas. In December 1986, GAL sold the Arcola property to Natchez Joint Venture.[2] Natchez was an entity comprised of three of the original six members involved in the Gemcraft and Great Western companies. The Natchez Group was also composed of three of the six individuals who initially signed the buy/sell agreement. The sale was considered by GAL to be a partial settlement of its claim against the parties. GAL got a judgment in its favor in June 1987, which was subsequently reversed by the Fourteenth Court of Appeals.[3] The case went to trial again in 1991, before the trial court, which entered judgment in GAL's favor. The Turboffs appeal the judgment.

■ The primary issue before us in this case is the proper interpretation of the buy/sell agreement. The Turboffs contend that the buy/sell agreement was an unambiguous document. According to the Turboffs, they did not breach the contract in this case because the buy/sell provided that the transfer of financing by First Texas to the Turboffs was required in order for them to perform under the contract. The Turboffs claim that the parties' agreement hinged totally upon their ability to get First Texas to transfer the financing to them in the event that GAL exercised its "put". The Turboffs argue that their agreement was wholly contingent upon them taking the property *subject to* the existing First Texas financing. First Texas never signed the agreement. Thus, according to the Turboffs, GAL was prevented from fulfilling its promise to convey the property "subject to" the existing financing. They argue that the conveyance of the property subject to existing financing was a condition precedent, the failure of which excused the Turboffs from their performance.

GAL counters with several arguments to oppose the Turboffs' construction. First, GAL argues that the Turboffs ignore the earlier opinion of the Fourteenth Court of Appeals which held that the intent of the parties was controlling in this case. They claim that the earlier case is the law of the case. GAL also argues that the Turboffs' interpretation of the "subject to" language in the buy/sell agreement ignores the plain language and contextual use of the words. Further, GAL asserts that the "subject to" language does not meet the requirements of a condition precedent because those words can easily be interpreted to mean something other than a condition precedent.

---

**2.** The details of the sale will be discussed in greater detail in the damage points in this opinion.

**3.** *Turboff v. Gertner, Aron & Ledet,* 763 S.W.2d 827 (Tex.App.—Houston [14th Dist.] 1988, writ ref'd n.r.e.).

The pertinent portions of the buy/sell agreement concerning the Turboffs' points on contract interpretation are, as follows:

*Section 2* ... The property shall be conveyed from Seller (GAL) to Buyer (Turboffs) *subject to* the easements, encumbrances and liens which exist on the Property as of the date of this Agreement, *the liens held by First Texas Savings Association,* a savings and loan association ("First Texas") and any restrictive covenants, plats, easements, and encumbrances created by Great Western and seller during the term of the Management agreement....

*Section 3* In the event the option is exercised, Buyer shall, on the Closing Date, accept the conveyance of the Property *subject to* the liens, encumbrances and security interests securing any debt referred to above which affects the Property. In addition, Buyer shall reimburse seller for all costs, fees and expenses paid by Seller pursuant to and in connection with the Management Agreement incurred prior to the Closing Date as a result of the maintenance and development of the Property less all revenues, profits, and proceeds received by Seller from the Property prior to the Closing Date, and Buyer shall service the existing debts secured by liens on the Property and referred to in Section 2 above, and Seller shall be relieved of such obligations. The amount of such reimbursement shall be determined from the books and records of accounting maintained by Great Western, or its successors or assigns, in connection with the performance of its duties and obligations under the terms of the Management Agreement.

Sections 6, 8, 14 and 16 of the buy/sell also contain references to the contemplated assumption of the loan by "buyer" and "consent" or "agreement" of First Texas.

▐ Appellants first claim that the "subject to" language in the contract was a condition precedent as a matter of law. A condition precedent may either be a condition to the formation of a contract or an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1 (Tex.1976). Conditions precedent may relate either to the formation of the contract or the liability under it. Conditions precedent to an obligation to perform are those acts which occur subsequently to the making of the contract that must occur before there is a right to immediate performance before there is a breach. In the absence of a limiting clause whether a certain contractual provision is a condition rather than a promise must be gathered from the contract as a whole and *the intent of the parties.* Where the intent of the parties is doubtful, the agreement will be interpreted as creating a covenant rather than a condition. Conditions precedent are not favored in the law.

In *Hohenberg,* the language which Gibbons claimed was a condition precedent was "As soon as compress warehouse receipts, samples ... are delivered to Geo. E. Gibbons & Co., they will be invoiced to you." There, the Court looked at the whole contract and determined that the shipment clause was descriptive of delivery rather than conditioning the duty to deliver. The court found it was not a condition precedent.

The Turboffs argue that language in *Pasadena Associates v. Connor*[4], which the Court found to be a condition precedent, is analogous to the "subject to" language in this case. In *Connor,* the agreement provided that the Connors, *upon receipt of such commitment,* would personally make available the interim financing. The Court found, considering the contract as a whole, that the Connors were not obligated unconditionally to finance the expansion project but were to become liable only upon the issuance of a mortgage loan commitment. The language in *Connor* anticipated that an act would occur before the party's duty to perform was triggered.

The language in this buy/sell agreement is not the same as the *Connor* case. Here, the buy/sell identifies the liens and encumbrances that could be inferior to the Tur-

---

**4.** 460 S.W.2d 473 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.).

boffs' title when the conveyance occurs. The buy/sell suggests that the Turboffs will accept the conveyance of the Arcola property *subject to* the easements, encumbrances, and liens which exist on the property as of the date of the agreement, the liens held by First Texas Savings Association, etc. This language in no way conditions performance on an agreement by First Texas to allow the transfer of financing from GAL to the Turboffs. Nor does the buy/sell condition the obligation of either party on obtaining the transfer of financing. The "subject to" language could reasonably be construed to mean that the status of the Turboffs title would be inferior to the First Texas lien.

The record shows that GAL and the Turboffs were sophisticated business people. If they had intended to make the transfer a condition to performance of the contract, the language of the buy/sell could have and should have contained language which clearly stated that the Turboffs were only required to purchase the property subject to an agreement on First Texas' part to allow them to assume the financing. It is clear that the transfer of the financing would have been desirable, but there is nothing in the contract to unambiguously show that it was by any means a condition to performance of the contract. Viewing the contract as a whole, we find nothing which specifically conditions performance of the contract on the agreement of First Texas to transfer financing.

The "subject to" language in the contract is easily susceptible to other meanings aside from the language constituting a "condition precedent." A reading of the "four corners" of the buy/sell agreement does not lend itself to that interpretation. The parties' own interpretations, which are each arguable, reinforce the position that the contractual meaning of the word "subject to" creates an ambiguity so that parol evidence could be properly admitted to interpret it.

We also find that the earlier opinion of the Fourteenth Court of Appeals [5] is the law of the case. For the law of the case to govern later appeals, questions of law must be at issue, the issues presented in the second case must be the same as in the first case, and the decision in the first appeal must not be clearly erroneous. *Barrows v. Ezer*, 624 S.W.2d 613, 617 (Tex. App.—Houston [14th Dist.] 1981, no writ). In the first Turboff case, the Fourteenth Court of Appeals held that the parties' intent was the controlling issue in the case. In that case, the Court reversed a judgment in favor of GAL which held the buy/sell agreement to be enforceable as a matter of law. On appeal, the Court held that a partial summary judgment raised a fact question concerning whether the parties contemplated the consent of First Texas as a condition to enforceability of the agreement. The Court reasoned that the jury should determine as a matter of fact the intentions of the parties. The jury had not determined that question because of the previously granted partial summary judgment. While not specifically so stating, the Court found the contract language to be ambiguous and its meaning subject to the decision of the trier of fact.

The Turboffs argue that the opinion of the Fourteenth Court of Appeals does not control because the first Turboff case dealt with the enforceability of the buy/sell agreement and the issue before the trial court in this case was contract interpretation. We view this as a distinction without a practical difference here. In the first Turboff case, the Fourteenth Court dealt specifically with the issue of enforceability, holding that the enforceability depended on whether the parties intended the signature of First Texas to be a condition of enforceability. That argument is in essence the same as the Turboffs make here. They urge us to interpret the contract to state that performance of the contract is conditioned upon language in the buy/sell agreement requiring the transfer of First Texas financing. In both cases, they argue that

5. *Turboff v. Gertner Aron & Ledet,* 763 S.W.2d 827 (Tex.App.—Houston [14th Dist.] 1988, writ ref'd n.r.e.).

the buy/sell agreement should not be performed or enforced because First Texas did not agree to transfer financing to them.

In its findings of fact, the trial court determined that the parties intended to be bound irrespective of First Texas' consent. The Turboffs do not challenge the sufficiency of the evidence to support that finding. They merely raise the issue that any evidence regarding intention of the parties is irrelevant because the contract is facially unambiguous. The unchallenged finding is binding. *DeLos Santos v. DeLos Santos,* 794 S.W.2d 528, 529 (Tex.App.—Corpus Christi 1990, no writ).

The Fourteenth Court of Appeals opinion is a sound one. The trial court attempted to follow it in the second trial by trying the issue of intent. No challenge is made to the findings. We overrule the Turboffs' first three points.

By points four, five and six, the Turboffs complain about the damages assessed against them. Without conceding error on the liability portion of the case, they argue that the trial court erred in failing to credit GAL's proceeds from its December 1986 sale of the property to the Natchez Joint Venture (Natchez), miscalculating the closing date that governed the computation of fees under section 4 of the buy/sell agreement, and making a prospective finding of liability on one aspect of GAL's claim. GAL asserts by cross points that it should receive its full contract fee under the buy/sell agreement because it has continued its performance to this day and that we should reform the judgment to include damages for which GAL may be liable on a supplemental guaranty.

## DAMAGES

The trial court's judgment awarded the following damages:

a. $1,750,000.00 plus interest pre-judgment from 12–31–86 through date of judgment of $441,000.00, together with interest post-judgment at 10% per annum until paid; [6]

b. $42,500.00 plus interest pre-judgment from 3–16–86 through judgment date of $12,736.03, together with interest post-judgment at 10% per annum until paid; [7]

c. $800,000.00 in attorney fees.

The trial court also awarded various amounts of reasonable attorneys fees for further appeals in the case.

*Double Recovery*

■ The Turboffs first argue that GAL's sale of the Arcola property to Natchez as a partial settlement establishes that GAL incurred no damages. In other words, the trial court's judgment amounts to a double recovery because the six signers of the agreement were joint obligors. As we stated earlier in this opinion, three of the individuals who signed the buy/sell agreement were members of the Natchez group that purchased the Arcola property from GAL. GAL had originally sued all six obligors, but released the Hutchinses and Romero, three of the six under the original buy/sell. GAL sold the property to the Natchez group as a partial settlement.

The Natchez sale occurred in December 1986. GAL transferred the Arcola property to Natchez in exchange for $311,000.00 cash for attorneys fees, payoff of the original loan and a 1 million dollar pledged CD. The CD was pledged to secure GAL's original guaranty from its note to First Texas. There was also testimony that GAL's liability under the guaranty was reduced from $3 million dollars to $1.75 million dollars. The Natchez settlement involved a financing scheme with four levels of collateral. The fourth level of collateral was GAL's 2 million dollar supplemental guaranty.

The purpose of the buy/sell agreement was to protect GAL from loss in connection with the purchase of the Arcola property. The Turboffs were in a difficult place financially at the time the deal was made. GAL wanted to be certain that it could get out at any time. According to the buy/sell,

---

6. This amount was what the trial court found that GAL was owed under section 4 of the buy/sell.

7. This was the amount the trial court found was owed to GAL for management expenses incurred through managing the Arcola property.

upon exercise of the "put", GAL would have received relief from its obligation to service the First Texas debt, a sliding fee under section 4 of the buy/sell, and reimbursement for management fees and expenses. Under the trial court's judgment, GAL received $1,750,000.00 as the section 4 fee, interest, $42,500 for reimbursements of the management fees and attorneys fees. The difference between what GAL received from the trial court's judgment and what it would have received under the buy/sell was the amount GAL received from the Natchez settlement, including additional earned attorneys' fees, and some unreimbursed expenses. Clearly, if everything had worked according to the buy/sell, GAL would have been relieved of liability on its loan with First Texas. However, because this didn't happen, it was incumbent upon GAL to reduce its losses. At the time GAL exercised its "put", the Turboffs were unable to perform their part of the bargain. GAL was left with no alternative other than attempting to somehow be relieved of the responsibility of servicing the debt to First Texas. It did so by selling the property to Natchez. The partial settlement did not relieve the Turboffs of the responsibility of their performance under the buy/sell or GAL's right to recover under the contract. GAL received neither the section 4 fee as a result of the settlement nor certain management fees it paid during the time the buy/sell was in effect. The damages received by GAL in the judgment were separate and apart from the payment that GAL received for the sale of the Arcola property. GAL was entitled to sell the property upon Turboffs' breach of the buy/sell agreement. The trial court was correct in assessing damages for breach of the buy/sell agreement. The amount GAL received in the Natchez sale settlement should not have been deducted in assessing those damages, other than those amounts properly deducted by the trial court.

*Contract Fee*

The Turboffs also argue by their fifth point of error that GAL should receive no more damages under section 4 than it was entitled to receive on March 16, 1986, which was ninety days after GAL exercised its put. GAL argues in its cross point that it should receive the full amount of 5 million dollars as a section 4 fee because GAL has not fully been relieved under the contract since GAL still remains liable to First Texas under a supplemental guaranty GAL would have been relieved of had the buy/sell been fully performed.

Section 4 of the buy/sell agreement provided that in the event the "put" option was exercised, a certain amount of consideration was to be paid by the Turboffs to GAL on the date of closing. The language of section 4 of the buy/sell read:

In the event the option is exercised by Seller (GAL), but only in that event, the following consideration shall be paid by Buyer to Seller on the Closing Date in addition to the sums provided for in Section 3 above.

The contract stated, in section 2, that the closing would occur 90 days after the election to "put". Section 4 was structured so that the signing parties would pay GAL $62,500.00 if the exercise of the "put" and date of closing was three months from the date of the agreement, up to a maximum $5 million if the date of the exercise and closing was five years and nine months to six years from the date of execution of the buy/sell.

The trial court's award for the contract fee was based on its determination that GAL should receive the amount that had accrued up until the time GAL closed the Natchez sale. The trial court therefore allowed GAL to receive the contract fee award that it would have received on December 31, 1986. We believe that this was proper.

A party that fully performs its contractual duties is entitled to recover the amount necessary to place it in the financial position it would have been in had the contract been fully performed by both parties. *Little Darling Corp. v. Ald, Inc.,* 566 S.W.2d 347, 349 (Tex.Civ.App.—Dallas 1978, no writ).

After the Turboffs repudiated the contract, GAL continued to perform by paying

the note to First Texas. If the buy/sell had been fulfilled, the contract payment to GAL would have commenced on March 16, 1986. This is because GAL exercised the "put" on December 16, 1985 and the contract said that closing would take place 90 days from the date that GAL made its election. Upon closing, GAL would have been relieved of liability on the First Texas note.

However, this is not what happened. Even though GAL exercised its "put" on December 16, 1985, the closing did not take place as anticipated on March 16, 1986. Rather than use that date, the trial court used the closing date of the Natchez sale. It was effectively a closing pursuant to the buy/sell because the property was closed by the settlement of the Natchez Group which was made up of three of the original signers.

GAL argued that the parties contracted in Section 4 to pay a fee as long as GAL had its credit extended for the Arcola property. Section 4, in fact, says that the fee will be paid on the closing date. It does not mention that it will extend until GAL no longer has its credit extended. There was testimony that the purpose of the section 4 fee was that GAL should be paid for the period of time that its credit was extended. The trial court, however, implicitly found that the section 4 fee was tied only to the closing of the property and apparently did not use that evidence to find that GAL was entitled to a greater section 4 fee. We find no error in this determination. We overrule the Turboffs' fifth point of error and GAL's first cross point.

*Cross Point on Indemnification*

 GAL urges by its second cross point that the trial court erred in refusing to enter findings of fact and conclusions of law which would indemnify them against liability to First Texas. GAL claims that it is entitled to recover an additional $1.75 million as damages on a supplemental guaranty. It further argues that it does not need to wait until it actually incurs a loss to recover that amount. Rather, GAL claims that the agreement created a direct obligation that did not require GAL to first pay the debt in order to recover.

GAL argues that the Turboffs agreed to indemnify GAL against liability in section 3 of the buy/sell agreement. The agreement was that the Turboffs would service the existing debts and that GAL would be relieved of such liability. The trial court found that through the buy/sell agreement, the Turboffs agreed to service the debt and relieve GAL of liability to First Texas. The court, in effect, concluded that GAL could not recover from the Turboffs for breach of this agreement until GAL paid to discharge its liability under a supplemental guaranty, and refused GAL's supplemental findings of fact and conclusions of law. The court instead concluded that the damages were too uncertain to be reduced to judgment at time judgment was entered. It found that if GAL pays money in the future to discharge its current liability under the supplemental guaranty, it can then seek to recover additional damages.

The testimony at trial was that GAL has not been asked to pay on the guaranty. There was also testimony that GAL had sought to settle its liability on the guaranty for $725,000.00 cash, which was not accepted.

The exact language of section 3, which GAL claims is an obligation to indemnify, is as follows: *"In the event the option is exercised, [the Turboffs] shall, on the Closing Date accept the conveyance of the Property subject to the liens, encumbrances and security interests securing any debt referred to above which affects the Property.* [The Turboffs] shall service the existing debts secured by liens on the property *and referred to in Section 2 above,* and [GAL] shall be relieved of such obligations".

 The language of the buy/sell shows that the Turboffs agreed to service the debt. Section 14(c) of the buy/sell states:

In the event ... the option contained in the Agreement is exercised by Buyer and Seller, First Texas further agrees that following the exercise of said option: (i) Buyer shall be allowed to assume the

duties, obligation and benefits of Seller under and pursuant to the loan documents by and between Seller and First Texas relating to the $27,550,000 loan; (ii) Seller shall be relieved from liability thereunder. . . .

Courts do not lightly infer indemnity obligations. *See UMC, Inc. v. Coonrod Elec. Co.*, 667 S.W.2d 549, 555 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). There should be a clear expression of intent to create such an obligation.

 The trial court was correct in its determination that at the point it entered judgment, no action had been taken on GAL's guaranty. Whether GAL would ever be called to make good its guaranty and the amount it would owe when that occurred is speculative. We do agree, however that language in section 3 of the buy/sell requires the Turboffs to relieve GAL of all liability on the note. We also agree with the trial court that in the event the Resolution Trust Corporation looks to GAL on the guaranty that the Turboffs will be liable for that amount because the buy/sell provides that GAL shall be relieved of obligations on the existing debts. At this point, it would be unfair to award GAL $1.75 million when it may not be called upon to pay that amount to First Texas.

We believe that this case is unlike those cases cited by GAL in which there is an agreement to pay an obligation regardless of whether the party has paid a debt. *See Smith v. Nesbitt*, 111 Tex. 186, 230 S.W. 976, 977–78 (1921). In *Smith*, the court held that Nesbitt's agreement to pay the "obligation" of Smith did not require Smith to pay the debt before suing.

Here, while there is an agreement to be relieved of all obligation, as of now, there is no obligation to pay, only the threat of obligation. While in this case, GAL's credit may be extended, there is no certain liability to be paid at this time. We overrule cross point two.

*Unrecovered Expenses*

 The Turboffs also argue that the trial court erred in allowing GAL to recover $42,500.00 in unrecovered expenses. Section 3 of the buy/sell agreement said

that in the event the "put" was exercised, the Turboffs would be liable for all costs, fees and expenses paid by GAL pursuant to the management agreement as a result of the maintenance and development of the property less revenues, profits and proceeds received by GAL prior to closing. The trial court awarded $42,000.00 plus interest. It arrived at its calculation by determining that GAL was owed $340,000.00 in unreimbursed management fees. The court offset that amount by $212,000.00 paid to GAL as "rent" based on the Natchez settlement. The trial court also offset the management fees by an $85,000.00 fee received called the Brewton fee. The Turboffs argue that the $340,000.00 was paid from advances made from the 27.55 million dollar First Texas loan. The *trial court stated on the record that he* understood section 3 of the buy/sell to provide for reimbursement to GAL of the expenses. The court determined that it did not matter where the expenses came from; it was still money paid by GAL which, according to the contract, should be paid. We find no error in the court's determination.

All points of error by all parties are overruled. The judgment of the trial court is affirmed.