# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 10, 2010

Charles R. Fulbruge III
Clerk

————————————

No. 09-20034

————————————

MARATHON E.G. HOLDING LIMITED AND
MARATHON E.G. PRODUCTION LIMITED,

Plaintiffs - Appellants

v.

CMS ENTERPRISES COMPANY,

Defendant - Appellee

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Before HIGGINBOTHAM and STEWART, Circuit Judges, and FELDMAN,[1] District Judge

FELDMAN, District Judge:

This litigation seeks to resolve a dispute concerning the scope of a contractual tax indemnity obligation. Appellants, Marathon E.G. Holdings Limited and Marathon E.G. Production Limited (collectively, "Marathon") appeal the district court's grant of summary judgment in favor of appellee, CMS

---

[1]  District Judge of the Eastern District of Louisiana, sitting by designation.

Enterprises Company. Marathon sued CMS for breach of contract arising out of CMS's refusal to indemnify Marathon for its payments to the Republic of Equatorial Guinea of: (1) $2,750,000 to in settlement of tax audits; and (2) $184,394.10 in withholding taxes. Marathon contends that the district court erred in determining that CMS was not obligated to indemnify Marathon for its $2.75 million tax settlement payment. Marathon further contends that the district court erred in determining that its claim to recover its payment of $184,394.10 in withholding taxes was time-barred. Unpersuaded, we reject both arguments and AFFIRM.

## I. FACTS AND PROCEEDINGS

In this Texas diversity breach of contract suit, we must interpret a tax indemnity provision in a Stock Purchase Agreement (SPA). In the district court, Marathon sought to recover from CMS on two claims: (1) for CMS's breach of the tax indemnity provision of the SPA as to $2.75 million that Marathon paid to the Republic of Equatorial Guinea to settle certain tax audit claims; and (2) for CMS's breach of the tax indemnity provision of the SPA as to $184,394.10 in withholding taxes paid by Marathon for the month of December 2001. The district court ruled in CMS's favor on both issues on summary judgment.

CMS Enterprises Company, a wholly-owned subsidiary of CMS Energy Corporation, an oil and gas exploration and production company, was the parent company of CMS Oil and Gas Company. Until January 2, 2002, one of CMS's exploration and production operations was located off the west coast of Africa, in the Republic of Equatorial Guinea; CMS had a contractual arrangement with Equatorial Guinea in which CMS and its co-venturers produced oil, gas, and condensate offshore for export and sale.

On October 31, 2001 CMS and Marathon E.G. Holding Limited executed an SPA in which Marathon bought all of the issued and outstanding

stock of three Cayman Island companies that held title to oil and gas reserves and had ownership interest in a liquefied petroleum gas plant located in Equatorial Guinea. On January 3, 2002 CMS sold to Marathon E.G. Holding Limited[2] all of its Equatorial Guinea assets through a stock sale.[3]

The negotiations leading up to the sale focused on the tax indemnity provisions. CMS's prepared financial documents showed that CMS had a large net operating loss on its books and on its tax returns filed with Equatorial Guinea. Specifically, as of December 31, 2000, CMS showed a net operating loss of $22,000,000, which CMS represented to Marathon had a tax asset value of $5,500,000. During the negotiations, Marathon requested that the draft SPA's proposed tax and indemnity provision be changed to expressly require CMS to indemnify Marathon for certain tax increases that might result from a reduction of CMS's net operating losses. In particular, Marathon proposed that Section 7.03 provide:

> It is understood, however, that Seller [CMS] shall pay all Taxes resulting from the transaction contemplated under this Stock Purchase Agreement and that Seller [CMS] shall be liable for any Tax occurring after December 31, 2001 *to the extent a net operating loss deduction is reduced or disallowed by the relevant Governmental Authority* or a depreciation deduction is reduced or disallowed for bases incurred prior to January 1, 2002, . . . .

This provision, however, was not included in the final SPA.

In the same draft, Marathon also proposed adding a provision that

---

[2] Marathon E.G. Holding Limited and Marathon E.G. Production (collectively, Marathon) are subsidiaries of Marathon Oil Company.

[3] All of the issued and outstanding shares of its Cayman Island companies -- the companies that held title to the oil in gas reserves in Equatorial Guinea -- were sold.

would have obligated CMS to indemnify Marathon for any breaches of CMS's representations of "Tax Items" in Section 4.14(a) of the SPA. The proposed subsection (c) of Section 7.03 stated:

> Seller [CMS] agrees to protect, defend, indemnify, and hold harmless Buyer . . . from and against, and agrees to pay . . . (c) any liability arising from a breach by Seller of its representations, warranties and covenants in Section 4.14 and Article VII.

This requested indemnity for CMS's representations of "Tax Items" was likewise not included in the final SPA.

Finally, Marathon also proposed a provision that would have required CMS to warrant the amount and availability to Marathon of certain "Tax Attributes," which included net operating losses. The proposed subpart (m) to Section 4.14 stated:

> (m) Schedule _____ sets forth as of the date hereof (i) the basis of the Companies and the Alba Companies in its assets for Equatorial Guinea Income Tax Purposes, and (ii) *the amount of any net operating loss*, net capital loss, unused investment credit or other credit (collectively referred to as the "Tax Attributes") of the Companies and the Alba Companies for Equatorial Guinea tax purposes. *These Tax Attributes will be available to Buyer.*

This proposed provision also was not included in the final SPA.

Instead, after all of the meetings and drafts exchanged and discussions between the parties,[4] the SPA's final tax indemnity provision

---

[4] According to Marathon, during meetings leading up to the execution of the SPA, CMS representatives orally stated that Marathon's proposed language as to net operating losses, and breach of Seller's representations, warranties and covenants, was not needed, and that such language was redundant, because CMS's prior version of paragraph 7.03 already provided an indemnity as to any taxes that the Companies might be required to pay if such taxes were attributable to the time period prior to January 1, 2002. Several times

provides:

> 7.03 <u>Indemnification by Seller</u>. Seller hereby agrees to protect, defend, indemnify and hold harmless the Buyer Indemnified Parties, the Companies and the Alba Companies from and against, and agrees to pay (a) any Taxes (net of any realized Tax benefits associated therewith) of the Companies or the Alba Companies (but only in an amount proportional to Seller's direct or indirect interest in the relevant Alba Company for the period to which such Taxes relate) attributable to the time period prior to January 1, 2002 (including, for the avoidance of doubt, any taxes of the Companies or the Alba Companies for the period prior to January 1, 2002 that are set forth on Schedule 4.14) but only to the extent such Taxes exceed the amount reserved for Taxes on the Settlement Statement . . . .
>
> Notwithstanding anything to the contrary in this Agreement, no claim for Taxes shall be permitted under this Section 7.03 unless such claim is first made before the expiration of the statute of limitations (including applicable extensions) for the taxable period to which the claim relates or if no such statute of limitations exists, prior to the date on which such claim is otherwise barred by law.

Pursuant to the SPA, Marathon and CMS closed the sale in January 2002; CMS Oil was renamed Marathon E.G. Production.

At the time of the SPA closing, CMS had provided Marathon with a settlement statement, setting forth the amount of withholding taxes accrued for the month of December 2001, which were due to be paid to Equatorial Guinea in January 2002. On January 15, 2002, Marathon paid $245,825.39 in

---

during negotiations, according to Marathon, CMS representatives orally stated that it was providing Marathon with a "full tax indemnity" for any taxes relating to CMS's period of ownership, and this "full tax indemnity" would obviate Marathon's concerns with items that might be discovered in Marathon's ongoing tax due diligence as to the Companies.

withholding taxes for the month of December 2001. CMS Oil had only accrued $61,431.29 in withholding tax liability for December 2001. As a result, Marathon paid $184,394.10 in withholding taxes for which it was not reimbursed by CMS. On January 21, 2005, Marathon notified CMS that it had made the withholding tax payment, and requested indemnity for $184,394.10. On receipt of the letter, CMS notified Marathon that CMS was reviewing the request. On October 3, 2006, CMS formally denied Marathon's claim for indemnity for the withholding tax payment.

Meanwhile, shortly after the sale in January 2002, Marathon received notice that the government of Equatorial Guinea was auditing CMS Oil's tax returns for the years 1997-2001. As of December 31, 2001, the size of CMS Oil's net operating loss had increased to $29,413,997.[5] The government indicated that it sought a reduction in Marathon E.G. Production's net operating losses and a payment of additional tax as a result. Marathon, in communication with CMS, handled the negotiations with Equatorial Guinea. In May 2007, after lengthy negotiations, Marathon and Equatorial Guinea resolved all outstanding tax audit issues for the years 1997-2001. The settlement agreement provided that Marathon E.G. Production's $29,413,997 in net operating losses would be reduced by $11,000,000, which resulted in a revised net operating loss of $18,413.997. "This Tax Loss position reduction," the settlement agreement provided, "will result in additional taxes paid to the State of USD $2,750,000." Thus, in consideration of the tax audit settlement, which cancelled all tax claims

_____

[5] From 1997 through 2001, CMS Oil filed corporate income tax returns with the government pursuant to Equatorial Guinea tax law. During that period, CMS Oil had incurred substantial net operating loses, due in part to extensive investment costs incurred in building the infrastructure for its operations and the depreciation of the assets that comprised that infrastructure; the income generated through sales of oil, gas, and condensate was not large enough to overcome those substantial operating losses.

for 1997-2001,[6] Marathon agreed to and paid to Equatorial Guinea $2,750,000 in May 2007.  On June 15, 2007, CMS denied Marathon's request for indemnity for this payment and again denied Marathon's request for indemnification as to $184,394.10 in withholding taxes.

This lawsuit followed.  The district court originally denied CMS's motion for partial summary judgment on Marathon's indemnity claim for the $2,750,000 tax settlement.  After Marathon filed a motion for partial summary judgment and CMS replied, however, the district court withdrew its prior Memorandum and Order and granted CMS's motion for partial summary judgment (and denied Marathon's motion for partial summary judgment) on the tax settlement claim.  Later, the district court granted CMS's motion for summary judgment (and denied Marathon's cross-motion for summary judgment) on Marathon's claim for withholding taxes; the district court held that Marathon's claim for indemnity was time-barred.  Final judgment dismissing Marathon's claims with prejudice was then entered.  Marathon now timely appeals.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, using the same standard as the district court.  Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995); Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000).  Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to

---

[6] The settlement agreement states, in part:

> Upon receipt of the final settlement amounts [including the $2,750,000] and execution of this Agreement, all audit POC and Fiscal claims and Tax Assessments from 1997 to 2001 shall be considered closed and final and not subject to future audit.

judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court considers the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d at 902. "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Id.

### III.

### A.

Marathon's first issue on appeal calls on us to determine whether the parties' contractual indemnity provision obligated CMS to indemnify Marathon for $2.75 million in taxes paid to Equatorial Guinea in 2007 as a result of Marathon's settlement of Equatorial Guinea's tax audit claims that spanned the period 1997-2001.

Texas law governs this dispute under the choice-of-law provision of the SPA. Indemnity agreements are construed under the traditional rules of contract construction. Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 422 (Tex. 2000). In construing a written contract, the Court's task is to ascertain the intentions of the parties as expressed in the contract. Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005); Frost Nat'l Bank v. L&F Distributors, Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005). In so doing, we give the terms of a contract their plain, ordinary, and generally accepted meaning unless the contract shows them to be used in a technical or different sense. Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)(citations omitted); Pratt-Shaw v. Pilgrim's Pride Corp., 122 S.W.3d 825, 829 (Tex. App.–Dallas 2003, pet. denied). A contract is not ambiguous when the contract is worded such that its terms can be given a definite meaning. Gulf Ins. Co., 22 S.W.3d at 422.

8

Texas law obliges courts to consider the circumstances prior to and contemporaneous with the making of a contract when construing disputed contract language. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968) (citing Restatement of Contracts § 230 (1932)). Such circumstances include prior negotiations. See id. at 518-19 (considering written negotiations between the parties in order to determine the meaning of a contract provision). Courts, however, may not consider parties' oral statements about what they intended the contract language to mean. Id. at 518 (citation omitted). Furthermore, indemnity agreements are strictly construed in favor of the indemnitor, and the indemnity must be clearly expressed. Mid-Continent Cas. Co. v. Swift Energy Co., 206 F.3d 487, 492 (5th Cir. 2000) (citation omitted); Turboff v. Gertner, Aron & Ledet Invs., 840 S.W.2d 603, 612 (Tex. App.—Corpus Christi 1992, writ dism'd).

Applying these principles, we turn to the SPA's indemnity provision. Section 7.03 provides that "Seller [CMS] hereby agrees to ... indemnify [Marathon] and agrees to pay ... any Taxes... attributable to the time period prior to January 1, 2002." The issue, then, is whether Marathon's payment in settlement of the Equatorial Guinea government's tax audit claims constitutes payment of "[t]axes attributable to the time period prior to January 1, 2002" within the meaning of the SPA. If so, CMS is obligated to indemnify Marathon. To decide this question, we must look at the plain, ordinary, and generally accepted meaning of "Taxes attributable to [a] time period," unless the SPA shows that the phrase was used in a technical or different sense.

CMS contends that we should affirm summary judgment in its favor on Marathon's $2.75 million claim because the SPA and the circumstances surrounding its execution reveal that the contracting parties, informed by well-settled tax practices, did not intend to require the indemnification claimed.

9

Because the taxes at issue resulted from income that Marathon generated in 2005, CMS maintains, those taxes are attributable to the period after January 1, 2002. Marathon advocates a more expansive interpretation of the tax indemnity provision: because the $2.75 million was paid in settlement of the tax audits for 1997-2001, Marathon insists, the payment was attributable to the time period prior to January 1, 2002 and, thus, indemnity is mandated. Marathon contends that the facts and circumstances surrounding the execution of the SPA, and the custom and usage evidence as to the interpretation of Section 7.03(a), are disputed and do not support summary judgment in favor of CMS. We disagree. The SPA's plain language, informed by the uncontroverted usage evidence, supports the decision of the district court.

We first observe that, by obligating CMS to indemnify Marathon for any "Taxes attributable to [a time period]", Section 7.03(a) appears to call for indemnity when Marathon pays taxes (as defined by the SPA) for the period with respect to which liability to pay the tax arises. This interpretation of the phrase "Taxes . . . attributable to" a time period is supported by the structure and intent, as well as the defined terms of the SPA. And we are impressed that the undisputed negotiations regarding Marathon's changes to the SPA were rejected.

Isolating the defined terms, Section 7.03(a) obligates CMS to indemnify Marathon for certain post-sale "Taxes" paid by Marathon. Notably, the SPA's definition of "Taxes", though broad, does not include net operating losses.[7] Instead, net operating losses are "Tax Items"[8] or "Tax Attributes."[9] That

_____

[7] According to the SPA, "Tax" or Taxes":

shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, premium, windfall profits, environmental, customs duties, capital stock, capital gain, petroleum profits, value added, franchise, profits, withholding, social security (or similar), unemployment,

the SPA, on its face, distinguishes between these terms seriously undermines Marathon's proposed construction of Section 7.03. But there's more. The parties' prior negotiations in drafting the SPA provide the relevant context for resolving the parties' dispute regarding the meaning of the tax indemnity provision: The record shows that Marathon's proposed language would have required CMS to expressly warrant the amount of the net operating loss and to indemnify it for any reduction of the loss and breach of the warranty. Critically absent from the final draft of the SPA, however, are Marathon's requested net operating loss warranty and the requested net operating loss indemnities. Furthermore, although the parties agreed to include a representation as to Tax Items (which include net operating losses), the final SPA did not include Marathon's requested indemnity for a breach of that specific representation.

Marathon seeks to soften the blow of this evidence -- that Marathon's suggested proposals, which would have included indemnity for net operating losses, was not incorporated into the final SPA -- by pointing to alleged oral promises of "full indemnity" made by CMS during prior negotiations. This conflicting evidence, says Marathon, creates a disputed issue of fact, making summary judgment in CMS's favor inappropriate. Marathon insists that the parties intended for CMS to indemnify Marathon for any changes to net

---

disability, real property, personal property, sales, use, transfer, registration, minimum, alternative or add-on minimum, estimated or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

[8] The SPA defines "Tax Items" as "items of income, gain, loss, deduction, credit, or other items" required to be included in a tax return.

[9] The final SPA does not include a definition for "Tax Attributes." However, during negotiations, Marathon proposed that "Tax Attributes" be defined as "the amount of any net operating loss, net capital loss, unused investment credit or other credit...."

operating losses: At "several times during the negotiations", we are told, CMS representatives orally stated that they were providing Marathon with a "'full tax indemnity' for any taxes relating to CMS' period of ownership." Marathon argues that these statements lend support to its broad interpretation of the tax indemnity provision. We disagree. Marathon's attempt to invoke oral statements to manufacture a disputed issue of material fact as to the parties' prior negotiations is foreclosed by fundamental maxims of contract interpretation. It is well-settled, and we underscore again, that courts may not consider "oral statements by the parties of what they intended [the contract] to mean" in determining the meaning of an otherwise unambiguous integrated contract. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968)(quoting Restatement of Contracts § 230 (1932)). The oral statements allegedly made by CMS representatives that Marathon would have "full tax indemnity" or that Marathon's proposed edits were redundant, offer us no guide as to the meaning of the SPA. Accordingly, the alleged oral representations do not present a fact issue as to the construction of the disputed provision that would preclude summary judgment in CMS's favor.

The SPA's terms, and the circumstances surrounding their negotiation, support CMS's proposed construction of the disputed provision. We find that the district court properly considered the operative uses of the relevant terms in the SPA in interpreting the indemnity provision.

CMS submitted operative usage evidence that informs the meaning of the disputed provision: CMS's expert, Stephen Salch, a tax attorney, explained tax definitions and practices applicable in international transactions, like that presented here. In the tax field, Salch explained, the terms "Taxes",

"Tax Attributes", and "Tax Items" are materially distinct terms.[10] This observation is consistent with the SPA's defined terms; the record confirms that the parties were aware of the operative usages of the terms "taxes" and "tax attributes." In fact, during negotiations prior to execution of the SPA, Marathon had requested inclusion of a new section 4.14(m), which would have defined "Tax Attributes" broadly and further would have specifically indemnified Marathon for a reduction in the amount of net operating losses. No such provision indemnifying Marathon for net operating loss reduction was included in the final SPA.

Usage evidence further informs the parties' intent regarding its use of "attributable to." This -- the time period to which the $2.75 million in taxes is "attributable" under Section 7.03(a) -- is what drives the parties' dispute. The district court favored CMS's proffered interpretation of "attributable to" based on the "annual accounting period" doctrine,[11] finding that taxes are only

---

[10] Salch explained:

Tax attributes are things such as a net operating loss or foreign tax credit available for carryback or carryforward that do not have an income tax effect in the annual accounting period for which they originate....

...

The Stock Purchase Agreement does not contain a definition of "Tax Attributes." As previously discussed, experienced tax practitioners regard a net operating loss carryforward as a tax attribute, not a Tax Item as defined in the Stock Purchase Agreement. It is also not a Tax as defined in the Stock Purchase Agreement, and its subsequent utilization is not a tax event within a taxable period prior to Closing.

[11] The doctrine provides that:

It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a

13

attributable to the tax year in which the tax income was earned; because the first year that Marathon earned income sufficient to pay taxes was 2005, the $2,750,000 settlement (though paid in 2007) is "attributable to" 2005. We agree. Marathon's tax settlement required a reduction in net operating loss for the period 1997-2001, but led to additional taxes for 2005.

Thus, the Court agrees with CMS, and the district court, that the

---

regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation.

Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931). Pursuant to this doctrine, taxes are only "attributable to" the tax year in which the taxed income was earned; taxes are not carried backward or forward to earlier or later time periods. On the other hand, tax attributes, like operating losses, may be attributable to time periods other than the period in which they are being applied to affect a taxpayer's overall tax liability. Marathon does not challenge the doctrine, but asserts that it has no application here. Marathon's argument finds no support in the record, which shows that the parties used the terms in Section 7.03(a) in a technical sense, with an understanding of the realities of customs and principles of taxation. Mr. Salch opined that the parties' knowledge of the annual accounting period doctrine at the execution of the SPA confirms that the parties used to the term "attributable to" as a technical term. The record confirms that the annual accounting period doctrine is well-known to tax practitioners and to the sophisticated parties here. Further, the tax laws of the United States and Equatorial Guinea embody the annual accounting period principle.

Marathon suggests that its proffered expert, Mr. E. Daniel Leightman, establishes that "attributable to" should be given its plain and ordinary meaning, or that, at the very least, its expert's testimony creates a fact issue as to the meaning of Section 7.03(a) of the SPA. We disagree. Leightman concluded that the $2,750,000 in taxes that Marathon E.G. Production paid in 2007 "is indisputably 'attributable to the time period prior to January 1, 2002.'" His conclusion, however, is belied by the terms of the SPA, as informed by the uncontroverted usage evidence. In focusing on the business purpose behind tax indemnity clauses in acquisitions and divestitures generally, Leightman wholly fails to address the distinction between Taxes and Tax Items or Tax Attributes; these distinctions are manifest in the SPA, which clearly used these terms in their technical sense. Leightman simply remarks generally that tax indemnity clauses are used to "allow a prompt closing of the sale, without the Buyer having to perform time consuming tax audits, and reviews of the tax returns and supporting documents, of the Seller as well as aspects of the Seller's business which could lead to tax exposure." He fails, however, to apply his general observations to the tax indemnity provision in question here, the scope of which is informed by established principles of taxation. Indeed, Leightman fails to refute, or even address the testimony of CMS's expert, the validity of the annual accounting principle, or the SPA's distinction between Taxes, Tax Items, and Tax Attributes.

$2.75 million tax settlement payment to Equatorial Guinea is "attributable to" the period in which the income to be taxed was earned, the year 2005. The plain language of the SPA, informed by the parties' prior negotiations and the usage evidence, clearly establishes that CMS was required to indemnify Marathon only for taxes paid for income that was earned before January 1, 2002. On the other hand, no indemnity obligation was triggered where, as here, a reduction in a tax attribute leads to a higher tax for a period after January 1, 2002. Accordingly, Marathon is not entitled to indemnity for its payment of $2,750,000 in taxes pursuant to its tax audit settlement with Equatorial Guinea.

The district court correctly granted summary judgment in favor of CMS on Marathon's tax settlement indemnity claim. We affirm the district court.

*B.*

The second issue we take up is whether Marathon's separate claim for indemnification for payment of withholding taxes is time-barred. The district court determined that the claim was time-barred because Marathon paid the withholding tax on January 15, 2002, but did not file suit to recover the payment until August 15, 2007. Marathon maintains that the district court applied the wrong accrual date; Marathon argues that its claim to recover the withholding tax payment accrued in October 2006, when CMS denied Marathon's request for indemnity. Finding that the district court applied the correct accrual date, we affirm the district court's grant of summary judgment in favor of CMS.

Under Texas law, claims for indemnity are governed by the four-year statute of limitations for actions on a debt. Tex. Civ. Prac. & Rem. Code § 16.04(a)(3); Smith Int'l, Inc. v. Egle Group, LLC, 490 F.3d 380, 386 (5th Cir. 2007). Texas law instructs that we must look to the contract's indemnity provision to determine the correct accrual date of an indemnity claim. Smith

15

Int'l, Inc., 490 F.3d at 388. Two types of indemnity provisions exist: those that indemnify against liabilities and those that indemnify against damages. Id. By way of contrast, under a liability indemnity provision, "the indemnitee's right to sue does not accrue . . . until liability becomes 'fixed and certain, as by rendition of a judgment, whether or not the indemnitee has yet suffered actual damages, as by payment of a judgment.'" Id. at 388-89 (quoting Ingersoll-Rand Co. v. Valero Energy. Corp., 997 S.W.2d 203, 207 (Tex. 1999)). Under a damages indemnity provision, "the indemnitee's right to sue does not accrue 'until the indemnitee has suffered damage or injury by being compelled to pay the judgment or debt.'" Id. at 389 (quoting Tubb v. Bartlett, 862 S.W.2d 740, 750 (Tex. App.—El Paso 1993, writ denied)). At the latest, then, the date of accrual for indemnity claims is the date on which the indemnitee suffered damage, such as by payment of a claim. Id. at 388-89 ("The very terms suggest an earlier date of accrual for liability indemnity agreements.").

In this case, Marathon paid the withholding tax for which it now seeks indemnification on January 15, 2002. On January 21, 2005, Marathon requested indemnity from CMS for the payment. CMS notified Marathon that CMS was reviewing the claim. On October 3, 2006 CMS denied Marathon's claim for indemnity for the withholding tax payment. Marathon filed this suit on August 15, 2007.

The issue becomes, then, when did Marathon's claim for indemnity accrue? CMS argues that it accrued in January 2002, when Marathon paid the withholding tax. Marathon urges that we find that it accrued in October 2006, when CMS denied Marathon's claim for indemnity. If it accrued in 2002, the claim is time-barred. If it accrued in 2006, it is not.

Texas' clear rule regarding the accrual date of indemnity claims for limitations purposes is dispositive here. The latest possible accrual date for

indemnity claims is the date on which the indemnitee suffered damage, such as by payment of a claim.    Smith Int'l, Inc., 490 F.3d at 388-89.    Marathon incurred its debt when it paid the withholding tax in January 2002.  Marathon did not file suit against CMS until August 2007, more than five years after the accrual date for its indemnity claim.  Therefore, its indemnity claim is time-barred.

Marathon insists that the SPA's indemnity provision dictates a different result.  Section 7.03 of the SPA provides:

> Notwithstanding anything to the contrary in this Agreement, no claim for Taxes shall be permitted under this Section 7.03 unless such claim is first made before the expiration of the statute of limitations (including applicable extensions) for the taxable period to which the claim relates or if no such statute of limitations exists, prior to the date on which such claim is otherwise barred by law.

Marathon argues that this "unusual claim presentment clause" creates a condition precedent: under 7.03, Marathon insists, its presentment of a claim for indemnity is a condition precedent to CMS's duty to indemnify Marathon and is, therefore, a condition precedent to suing CMS on that claim.  Thus, Marathon posits, its cause of action for breach of contract did not accrue until CMS denied Marathon's claim for indemnity.

Like the district court, we are unpersuaded.  Nothing in the language of the SPA suggests that the parties intended to create a condition precedent to Marathon's filing suit for indemnity.  Section 7.03 simply provides that a claim shall not be permitted unless it is timely made.  Putting aside the parties' dispute regarding the proper definition of "claim" in Section 7.03, we observe that language in a contract is not construed to create a condition precedent if another reading of that language is possible. Powers v. Powers, 714

17

S.W.2d 384, 388 (Tex. App.—Corpus Christi 1986, no writ)(citation omitted); see Turboff v. Gertner, Aron & Ledet Invs., 840 S.W.2d 603, 612 (Tex. App.—Corpus Christi 1992, writ dism'd)("[c]onditions precedent are not favored in the law"). Furthermore, even if Marathon's demand for indemnification were a condition to Marathon's right to sue, that fact would not necessarily change the date of accrual. As explained in Moreno v. City of El Paso, notice of claim provisions, while common, do not always "serve to extend the statute of limitations." 71 S.W.3d 898, 902 (Tex. App.—El Paso 2002, no pet.). In fact, notice of claim provisions will extend the statute of limitations only when they either: (1) bar commencement of an action for a stated period of time, or (2) require some third party to take some action before the plaintiff can sue such that the resulting delay is beyond the plaintiff's control. Id. Neither situation is applicable in this case. Therefore, Marathon's argument that Section 7.03 creates a condition precedent that delays the date of accrual fails.[12]

Marathon advances a variation on its prior argument in support of its withholding tax indemnity claim: because its claim is for breach of contract, the cause of action did not accrue until CMS denied its claim for indemnity. CMS was not in breach of the contract, the argument goes, until it refused to indemnify Marathon for the withholding taxes paid. Therefore, Marathon contends, its cause of action for breach of contract accrued only in October 2006. Again, we disagree.

While Marathon's claim is for breach of contract, it relates to a

---

[12] Indeed, even if the SPA required formal demand for payment, Marathon's right to sue did not depend on CMS; rather it was Marathon's own conduct that delayed suit. See Moreno v. City of El Paso, 71 S.W.3d 898, 902-03 (Tex. App. 2002) (explaining that when a party's right to sue does not depend on the actions of another party, even a condition precedent will not toll the statute of limitations). Nothing in Section 7.03 of the SPA suggests that Marathon must wait for CMS's response to its demand for indemnity, before filing suit.

specific indemnity provision, for which a specific accrual rule applies. (Ultimately, Marathon's breach of contract contention would be more persuasive if it applied to a provision dealing with matters other than indemnification.) Indeed, the Supreme Court of Texas has firmly stated "a specific accrual rule applies to claims for indemnification." Ingersoll-Rand Co. v. Valero, 997 S.W.2d 203, 210 (Tex. 1999). This specific accrual rule, we repeat, establishes that the cause of action for indemnity claims accrues, at the latest, on the date on which the indemnitee suffered damage, such as by payment of a claim or judgment. Smith Int'l, Inc., 490 F.3d at 388-89. Marathon paid the withholding taxes more than five years before it filed this suit. Therefore, its claim for indemnity is time-barred.

## IV. CONCLUSION

CMS was not obligated to indemnify Marathon for $2,750,000 in taxes paid to the Government as a result of its settlement of tax audit claims because the taxes are not attributable to the period before January 1, 2002 within the meaning of the parties unambiguous agreement. While the tax audit related to the years 1997-2001, the taxes were owed on income generated in 2005, thereby making them fall outside the scope of the SPA's indemnity provision. Furthermore, Marathon's withholding tax indemnity claim was time-barred because it was filed more than five years after the payment of the withholding tax. For the foregoing reasons, the judgment of the district court, granting summary judgment in favor of CMS, is AFFIRMED.