Opinion issued October 7, 2014



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00258-CV

_____

**INTERNACIONAL REALTY, INC., Appellant**

**V.**

**2005 RP WEST, LTD., Appellee**

On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Case No. 08-DCV-166063

## O P I N I O N

Appellee 2005 RP West, Ltd. sued appellant Internacional Realty, Inc. for breach of a real-estate purchase agreement. The dispute in this appeal primarily concerns the interpretation of the contract to determine what remedy was available

to the seller for a breach by the buyer. The trial court rendered judgment on the jury verdict, awarding the buyer $4 million in damages, plus pre- and post-judgment interest and attorney's fees, and the seller challenges that judgment on appeal.

We affirm.

## Background

Hugh Caraway, Jr. was the owner of Internacional Realty, Inc. ("IRI"). Beginning in 1993, IRI developed and purchased apartment complexes with Caraway's equity and third-party financing. At one point, IRI managed "about 10,000 apartment units in five or six states." However, IRI sold many properties between 2006 and 2008, and by the time of trial in this case, its primary business involved "payroll servicing" and ownership of master leases. Caraway was also involved with two related companies: Internacional Realty Management, which was primarily engaged in third-party property management; and Internacional Realty Mortgage Investors, which arranged real-estate financing for IRI and others.

Robert Wilson is a real-estate developer. Over more than 40 years of experience in the real-estate business, he developed approximately ten apartment complex properties in Texas, including two in Fort Bend County: The Reserve and The Villas. Wilson also worked in mortgage banking for over 25 years.

Caraway and Wilson met in the 1980s. Before the transaction that gave rise to this case, Caraway bought three properties developed by Wilson, including The Reserve apartment complex. Both Caraway and Wilson contemplated that The Reserve was Phase I of an overall development plan, which would culminate with Phase II, The Villas, to be located near The Reserve. Wilson formed 2005 RP West, Ltd. ("RP West"), a single-asset limited partnership, for the purpose of developing and building The Villas. Wilson is both a limited partner of RP West and the president and sole employee of Wilson RP West GP, LLC, which serves as the general partner of RP West.

In March 2006, Carraway and Wilson signed a contract, the "Villas Agreement." Pursuant to this agreement, RP West agreed to build The Villas, and IRI agreed to purchase that complex upon completion for $21.5 million, with closing to occur no later than April 1, 2008. The Villas Agreement was not made contingent upon IRI securing financing. As required by the contract, IRI deposited $215,000 in earnest money with a title company.

The Villas Agreement provided remedies for both parties in the event of a breach of the agreement by the other. In the event that IRI breached the agreement to purchase The Villas, RP West could elect one of the following three "sole and exclusive remedies": "(i) terminate this Agreement and thereupon shall be entitled to the Earnest Money as liquidated damages (and not as a penalty), or (ii) put the

Property to Purchaser and sue Purchaser for the Purchase Price, or (iii) pursue the remedy of specific performance of Purchaser's obligations under this Agreement." The agreement stated that the parties had provided an option for liquidated damages "because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and Seller and Purchaser agree that these sums represent reasonable compensation to Seller for such breach." In addition, if the "put" remedy were elected, the contract specified that RP West, as seller, would have "all rights of offset against Purchaser to which Seller may be entitled at law or in equity . . . ."

RP West financed construction of The Villas with a construction loan from Amegy Bank for $16.2 million, which Wilson personally guaranteed. The Amegy Bank loan was originally due on March 6, 2008. As a condition of this loan, Amegy Bank required both RP West and IRI to sign a "Tri-Party Agreement." Under this agreement, IRI acknowledged and consented to the construction loan documents securing the loan, specifically RP West's assignment to Amegy Bank of its rights under the Villas Agreement, expressly including the right to earnest money. This agreement also gave Amegy Bank the right to sue for specific performance should IRI default on its obligation to purchase The Villas.

Because the construction and development cost of The Villas exceeded $16.2 million, RP West took a second "mezzanine loan" for $2,113,500 from IRA

4

River Park West II Mezzanine, Ltd., a Texas limited partnership. Caraway was the manager of the general partner of this partnership. The mezzanine lender had repayment rights superior to the equity investors but inferior to Amegy Bank. But the mezzanine loan was not secured by a second lien; rather the mezzanine lender "just had an assignment of the . . . individual partner's interest in 2005 RP West."

Approximately a year after IRI and RP West signed the Villas Agreement, and before construction of the complex was completed, IRI agreed to sell 12 properties, including The Reserve and The Villas, to an investor named Dennis Trimarchi for a combined price of more than $318 million.[1] Of that amount, Trimarchi had offered $23,760,000 for The Villas. Thus, by assigning its rights under the Villas Agreement to Trimarchi, IRI stood to receive approximately $2.26 million more than it was obligated to pay for the property under the Villas Agreement. Caraway intended to close on the purchase of The Villas from RP West (in fulfillment of the Villas Agreement) and to simultaneously close on the resale of the property to Trimarchi.

---

[1] The agreement was prepared on the letterhead of Trimarchi Management and signed by Dennis Trimarchi as "CEO / Managing Member" of DMT, LLC. The agreement identified the buyer as "DMT, LLC or its nominee." For our purposes, we refer to Dennis Trimarchi and his businesses collectively as "Trimarchi."

Caraway sent Wilson an email explaining the Trimarchi deal and requesting (1) a change in the closing date, (2) release of IRI's $215,000 earnest money held by the title company, and (3) an agreement to replace the $215,000 earnest money with the earnest money that Trimarchi would provide in connection with his contract with IRI. RP West and IRI later signed an amendment to the Villas Agreement, which released the original $215,000 earnest money to IRI, required redeposit of such earnest money if the Trimarchi contract were "not executed by September 21, 2007," and included the following "Assignment of Trimarchi Earnest Money": "Purchaser hereby assigns to Seller all of Purchaser's right, title and interest in and to the Trimarchi Earnest Money, which assignment shall become effective immediately upon execution of the Trimarchi contract. Such assignment is intended to serve as a replacement of the earnest money deposit otherwise provided for under the Villas Contract." The amendment also stated, "In the event of a conflict between the terms of this Amendment and the other terms of the Contract, the terms of this Amendment shall control."

RP West released the earnest money in accordance with the amendment. The Trimarchi contract was signed before September 21, 2007, and Trimarchi deposited earnest money with Beacon Title as required by the contract with IRI. Trimarchi was able to secure financing for 10 of the 12 properties, but on October 1, 2007, it terminated the contract with IRI as to The Reserve and The

6

Villas. Caraway did not immediately inform Wilson that Trimarchi terminated their contract with respect to The Villas. The next day, Wilson emailed Caraway to inquire about closing on The Villas, and he responded, "We are still scheduled to close November 15."

Two days later, Beacon Title released to IRI $74,579 in earnest money from the Trimarchi agreement to purchase The Villas. Despite the assignment language in the amendment to the Villas Agreement, IRI kept the money. At trial Caraway could not recall whether he had informed RP West about having received this earnest money, but he said that he kept it because he was continuing to negotiate with Trimarchi, still believing that the sale of The Villas would close on November 15, 2007 as planned. At that time, IRI did not have $21.5 million in cash, and it was not working to obtain financing to complete its purchase of The Villas in the event that the Trimarchi negotiations failed. Caraway acknowledged at trial that nothing in the contract with RP West would "let [him] off the hook" if the Trimarchi deal fell through.

Trimarchi did not close on The Villas on November 15. Instead, the Trimarchi contract with IRI was amended to require closing on The Villas by January 18, 2008, and Wilson orally agreed to the change in closing date. But by late December 2007, Caraway became aware that Trimarchi was unable to secure financing to purchase The Villas. On January 2, 2008, Wilson sent Caraway an

7

email asking if closing on The Villas was "still on" for January 18. Caraway responded that he would know by Friday of that week, depending on Trimarchi's financing. But on Friday Trimarchi defaulted on the contract to purchase The Villas by failing to deposit new earnest money. IRI had not secured alternate financing, and it found itself unable to perform on its contract with RP West.

Approximately one week later, RP West's counsel sent an email to IRI's counsel, stating that IRI was in default of the Villas Agreement and asking Caraway to remit to RP West "the earnest money originally required pursuant to the contract and required to be redeposited in the amendment in the event the so-called Trimarchi contract was not executed by September 21, 2007." In addition, the email specifically reserved RP West's right to pursue any available remedy for breach of the contract, stating: "Nothing in this letter is intended or should be construed either as a waiver or an election of any remedy for breach of contract and my client hereby expressly reserves any and all such remedies, including rescission of the amendment for breach thereof."

In mid-January, about a week after the email demand, Wilson wrote to Caraway, requesting that IRI redeposit the $215,000 earnest money that was released pursuant to the amendment to the Villas Agreement and stating that if the money were not redeposited, RP West would contact the title company to obtain the Trimarchi earnest money that had been assigned to it under the amendment.

But the money was not on deposit with the title company. Caraway testified that it was "on deposit with Internacional Realty," and that if Trimarchi defaulted and the contract terminated, the money would belong to IRI.

On January 22, 2008, Caraway told Wilson that IRI still intended to perform under the contract. But Wilson responded by email, saying that "a majority of the limited partners have requested the general partner proceed with finding another buyer for The Villas (ASAP) and are requesting [IRI] pay the earnest money to the partnership per the amendment asap."

Nevertheless, IRI's attorney sent a proposed second amendment to the Villas Agreement to RP West's attorney. The proposed second amendment included provisions that had not been discussed between the parties. RP West's attorney rejected the proposed second amendment, clarifying that "other than having waited past the November" closing date, "there are no understandings or oral agreements between the parties modifying" the amendment to the contract. The letter requested that IRI immediately pay the Trimarchi earnest money to RP West or provide contact information to facilitate obtaining the earnest money from the title company. Finally, the letter stated:

> My client may yet be willing to negotiate with yours regarding the acquisition of the subject property on some basis, but wants yours to understand our legal position, has not and does not hereby waive any of its rights or remedies arising either under the contract or at law and expressly disclaims any oral agreements or understandings at variance with the First Amendment to the original contract. Unless my client

9

gets some immediate, satisfactory response, the general partner intends to list the property for sale with a third party broker.

In late January, Caraway mailed a check for $215,000 to Wilson, who remitted it to Amegy Bank in accordance with the Tri-Party Agreement. Wilson testified that he was still working with Caraway to find a way for IRI to purchase The Villas at that time, and internal IRI emails showed that it was still looking for financing during February 2008.

Throughout 2008, RP West attempted to find a buyer for The Villas. Both the Amegy Bank and mezzanine loans were extended during this time frame. As part of the process of extending the mezzanine loan, RP West's accounting firm sent the mezzanine lender a financial statement that showed a $215,000 credit for "proceeds from terminated contract for project sale."

At trial, Caraway testified that he believed that the payment of the earnest money to RP West terminated the contract and ended any further obligation regarding The Villas. However, he also testified that IRI breached the contract, that Wilson did not exclude IRI from purchasing The Villas, and that it was "entirely possible" that he told Wilson to find another buyer. Indeed, Caraway testified that he and Wilson had decided to market The Reserve and The Villas together, but under separate listing agreements due to their separate ownership.

Wilson repeatedly testified that RP West did not terminate the contract, did not elect to keep the earnest money as contract damages, and did "put" the property to IRI.

IRI never bought The Villas. From January through August 2008, IRI did not secure financing to do so, and at trial Caraway testified that the national banking crisis made it impossible for him to obtain financing in the fall of 2008.

In August 2008, Wilson informed Caraway that he had been unable to find a buyer willing to pay more than what IRI had agreed to pay in the Villas Agreement. On August 15, 2008, Wilson emailed Caraway, saying that "a third party market sale is not likely" and "[g]iven the situation, [RP West] is exploring all options, but what [RP West] really prefers is that [IRI] purchase the property as originally planned/agreed."

In early September 2008, Wilson sent Caraway a demand letter that reminded Caraway of his January 22 email stating his intention to purchase The Villas:

> RP West still expects IRI to purchase the Property as originally agreed under the Contract. However, because IRI is in default of its obligations to purchase the Property, RP West authorized suit to be filed in order to promptly pursue its PUT in the event IRI is unwilling to proceed with the transaction. RP West has withheld service of the petition on IRI in hopes that IRI will honor its obligation to purchase the Property. A copy of the filed petition is attached to this letter. RP West will agree to defer service and/or extend IRI's answer date so long as satisfactory progress is being made toward the purchase of the Property.

Caraway did not respond to this letter, and he testified that he was surprised because he believed that the contract had previously been terminated and that RP West had elected to keep the earnest money as contract damages.

Meanwhile, RP West moved forward with its lawsuit, and it continued to seek a buyer for The Villas to mitigate its damages. RP West eventually sold The Villas more than two years later, in December 2010, for $16.9 million, which Caraway agreed was a reasonable price. At trial, Caraway testified that IRI initially raised RP West's failure to mitigate its losses by selling The Villas to a third party as a bar to RP West's recovery on its breach-of-contract claim. However, by the time of trial, IRI contended that RP West's sale of The Villas to a third party negated the contractual "put" remedy because RP West was no longer in a position to convey The Villas to IRI.

The case was ultimately tried to a jury. At the close of RP West's evidence, IRI moved for a directed verdict. IRI argued that the evidence at trial conclusively established that RP West elected the earnest-money remedy and terminated the contract in January 2008. IRI contended that RP West did not plead mitigation and had no mitigation reason to have sold the property to a third party. IRI further argued that RP West waived its right to recover—or was estopped to recover— because it elected the earnest-money remedy, remained silent after January 2008, and sold The Villas to a third party. IRI argued that any judgment allowing RP

West to recover under the Villas Agreement was barred by impossibility as a matter of law; that is, RP West could not elect the "put" remedy because it no longer owned The Villas and thus it was "impossible" for RP West to convey it. In addition, IRI contended that the "put" remedy was no longer available to RP West because the requirements for seeking specific performance—like remaining ready, willing, and able to perform until the date of trial—were not satisfied.

The trial court denied IRI's motion for directed verdict. The jury found that (1) the assignment of the Trimarchi earnest money was not "complete and unconditional," (2) RP West did not elect the earnest-money remedy and did elect the "put" remedy, and (3) IRI's failure to comply with the Villas Agreement as amended was not excused by impossibility. The jury awarded $4 million in damages to RP West.

IRI filed a motion to disregard the jury findings and for judgment n.o.v. This motion reiterated all of the arguments IRI made in support of its motion for directed verdict. It further argued that RP West was entitled only to $215,000 in liquidated damages and could not recover monetary damages because both the "put" and specific performance remedies required RP West to convey The Villas to IRI. Because RP West had sold The Villas to a third party, IRI argued those two contractual remedies were unavailable.

13

In its motion for judgment n.o.v., IRI argued that RP West repudiated the Villas Agreement by repeatedly stating that IRI had no enforceable right to purchase The Villas and was in default, by demanding forfeiture of the earnest money, and by communicating RP West's intent to find a new buyer.[2] IRI also argued that the "put" remedy was no longer available to RP West because the requirements for seeking specific performance—like remaining ready, willing, and able to perform until the date of trial—were not satisfied. IRI argued that RP West's sale could not have been in furtherance of mitigation of damages because RP West had no duty to mitigate under the contract.

The trial court rendered judgment on the verdict in favor of RP West for $4 million plus prejudgment interest and attorneys' fees. IRI filed a motion for new trial, which was overruled by operation of law, and it timely filed a notice of appeal.

---

[2] IRI further argued that the jury's "no" answer to question number one, which inquired if the assignment of the Trimarchi earnest money was "complete and unconditional," meant that the Trimarchi earnest money "was intended to serve as the Earnest Money securing the [Villas Agreement] for the Villas." However, it could also have meant that the Trimarchi earnest money was complete but conditional. As such, this question does not affect the verdict and is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) ("A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings.").

**Analysis**

IRI brings eight issues on appeal, each of which includes multiple sub-issues. In its first issue, IRI challenges the trial court's denials of its motions for directed verdict, to disregard jury findings, and for judgment n.o.v., all of which were based on its interpretation of the exclusive remedies specified in the Villas Agreement. In its second, third, and fourth issues, IRI challenges the trial court's rulings on its defenses of impossibility, waiver, and estoppel. IRI's fifth issue challenges the trial court's ruling and the jury's finding that RP West did not choose to retain IRI's earnest money and terminate the agreement as a remedy for breach of contract. The sixth issue challenges the sufficiency of the evidence to support the jury's finding that RP West chose the contractual remedy of "put[ting] the Property to [IRI] and su[ing] [IRI] for the Purchase Price." In its seventh issue, IRI argues that the evidence is legally and factually insufficient to support the jury's damages award and that the trial court erred in failing to instruct the jury on the correct measure of damages. Finally, in its eighth issue, IRI contends that the trial court erred by awarding RP West attorney's fees and pre-and post-judgment interest. Further, assuming success on its other issues, IRI asks this court to render judgment that it should recover attorney's fees as a prevailing party under the contract.

## I.     Interpretation of the contract

In its first issue, IRI contends that the trial court erred by denying its various post-verdict motions because the Villas Agreement was unambiguous, the "put" remedy was foreclosed by RP West's sale of the apartment complex to a third party, and that particular contractual remedy does not allow recovery of actual damages.

The dispute centers on the meaning of one of the three "sole and exclusive remedies" available to the purchaser under the contract: the right to "put the Property to Purchaser and sue Purchaser for the Purchase Price," which includes the seller's right to retain "all rights of offset against Purchaser to which Seller may be entitled at law or in equity including the Earnest Money and any sums owed by Seller to Purchaser in respect of such construction financing or otherwise." Despite the fact that this agreement was executed by sophisticated parties with ample experience in real-estate transactions, our legal research has not revealed any published opinion in any United States jurisdiction construing this language. Both parties argue that the contract is unambiguous, but they advance different interpretations of the "put" remedy provision.

In considering this issue, we are especially mindful that the trial court rendered judgment on the verdict after a trial in which each side had the opportunity to present evidence and argument advancing its interpretation of the

"put" remedy. IRI contended that the "put" remedy would require that RP West actually transfer the property to it. RP West contended that the "put" remedy permitted it to sell the complex to a third party and to sue IRI for the difference between the contract price of $21.5 million and the earnest money plus third-party sales price. The jury agreed with RP West's understanding of the contract, affirmatively finding in its verdict that the put remedy was elected as the remedy for IRI's default. Our task is to determine whether this was a legally permissible outcome given the contractual language.[3]

"'A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.'" *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *accord In re*

---

[3] A trial court may order a directed verdict in favor of a defendant when: (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery; or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A motion for judgment n.o.v. should be granted if the evidence is legally insufficient to support the jury's findings or if a directed verdict would have been proper because a legal principle precludes recovery. TEX. R. CIV. P. 301; *see Fort Bend Cnty. Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991). Similarly, a court may disregard a jury finding if it is unsupported by evidence or if the issue is immaterial, i.e., it should not have been submitted or was properly submitted and rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex. 1994).

*D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A simple lack of clarity or disagreement between parties does not necessarily render a term ambiguous. *See DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). If, however, a contract is susceptible to two or more reasonable interpretations, it creates a fact issue for the trier of fact. *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 38–39 (Tex. 2012).

Here, the trial court did not expressly rule on the interpretation of the contract as a matter of law. Rather, the parties argued their respective positions to the jury, which determined that RP West elected the "put" remedy and determined the amount of damages that would make it whole based on the evidence. The court then rendered judgment on the jury's verdict, overruling IRI's post-verdict motions by stating in the judgment that "[a]ll relief not expressly granted herein is DENIED."

IRI contends the court erred by denying its post-verdict motions because its interpretation of the put remedy, which was implicitly rejected by the jury's verdict, was correct as a matter of law. RP West, on the other hand, argues that IRI's proposed construction is unreasonable as a matter of law.

If IRI's interpretation were the only reasonable interpretation, then the trial court would have erred in denying its post-verdict motions. But if RP West's

18

interpretation were a reasonable interpretation—regardless of whether it was the only reasonable interpretation, or one of several reasonable interpretations—then IRI's appeal must fail, regardless of whether its own interpretation was also reasonable. As such, this appeal does not require us to resolve the question of whether the text of the "put" remedy had one unambiguous meaning. All we must determine is whether RP West's interpretation that was accepted by the jury is itself reasonable, i.e., that the put remedy provision is reasonably susceptible to the understanding that IRI could be sued for the purchase price, less offsets, including mitigation of damages by selling The Villas to a third party.

"When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). To determine the intent of the parties, we examine the entire writing and strive to harmonize and give effect to all provisions in the contract, so that no provision is rendered meaningless. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011). In doing so, we give contract terms "'their plain and ordinary meaning, unless the contract indicates that the parties intended a different meaning.'" *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)).

Section 8.2 of the Villas Agreement, which governs a "Breach by Purchaser," sets forth specific "sole and exclusive remedies" available to RP West, as seller, in the event of a breach of contract by IRI, as purchaser. Under the agreement, RP West may elect to:

i.   terminate this Agreement and thereupon shall be entitled to the Earnest Money as liquidated damages (and not as a penalty), or

ii.  put the Property to Purchaser and sue Purchaser for the Purchase Price, or

iii. pursue the remedy of specific performance of Purchaser's obligations under this Agreement.

The agreement further provides that if RP West, as aggrieved seller, elected to "put" the property to IRI and sue for the purchase price, RP West would have "all rights of offset against Purchaser [IRI] to which Seller [RP West] may be entitled at law or in equity including the Earnest Money and any sums owed by Seller to Purchaser in respect of such construction financing or otherwise, such right of offset to be applicable against any such debt and assertable against any subsequent holder thereof."[4]

---

[4]   The reference to "any sums owed by Seller to Purchaser in respect of such construction financing" refers to IRI's agreement to "loan certain funds" to RP West "to finance the construction" of The Villas, apparently in anticipation of the mezzanine financing later arranged by a lender managed by Caraway.

The first remedy provided in the agreement is for the seller, RP West, simply to keep the earnest money and terminate the contract. The third remedy is to "pursue the remedy of specific performance" by IRI of its obligations as purchaser.[5] "The purpose of specific performance is to compel a party who is violating a duty to perform under a valid contract to comply with his obligations." *Griffin's Estate v. Sumner*, 604 S.W.2d 221, 225 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.). It is an equitable remedy employed when "the recovery of monetary damages would be inadequate to compensate the complainant." *Id.*

The second remedy in the Villas Agreement is the "put" remedy. Unlike the other relatively straightforward remedy options, the contractual provision that the seller may "put the Property to Purchaser and sue Purchaser for the Purchase

---

[5] "'[T]o be entitled to specific performance, the plaintiff must show that it has substantially performed its part of the contract, and that it is able to continue performing its part of the agreement. The plaintiff's burden of proving readiness, willingness and ability is a continuing one that extends to all times relevant to the contract and thereafter.'" *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008) (quoting 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 67:15, at 236–37 (4th ed. 2002) (citations omitted)). "[A] plaintiff seeking specific performance, as a general rule, must actually tender performance as a prerequisite to obtaining specific performance." *Id.* at 594 (citing *McMillan v. Smith*, 363 S.W.2d 437, 442–43 (Tex. 1962)). Nevertheless, "when a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering his or her performance to the repudiating party before filing suit for specific performance." *Id.*

Price" is hardly a paragon of clarity. The contract does not define or otherwise detail the manner in which the "put" is to be exercised.

IRI argues that because this remedy allows RP West to "put the Property to Purchaser," and because it is the only party defined under the agreement as the "Purchaser," the provision cannot be read to allow the property to be "put" to a third party. Thus the essential crux of IRI's argument is that for RP West to exercise the "put" remedy, the property had to be actually transferred to IRI, and not to any third-party.[6] To establish this meaning of "put" in the contract, IRI contends that its "customary meaning in a real estate agreement"[7] is also its "plain, common sense" meaning: that the object of the put—the deed or title to the

---

[6] IRI also observes that the put remedy only authorizes a suit for the "Purchase Price," defined to be $21.5 million, but this argument neglects the effect of other contractual language that allows offsets from the Purchase Price.

[7] IRI and our concurring colleage both allude to the concept that the "put" remedy as incorporated in the Villas Agreement has some objectively discernable meaning due to its trade usage in the real-estate context. *See, e.g.*, *Restatement (Second) of Contracts* § 222(1) (1981) ("A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement."). We note, however, that IRI has not actually presented any evidence or argument that the language at issue is commonly used or that it has a commonly understood meaning. *See id*. § 222(2) ("The existence and scope of a usage of trade are to be determined as questions of fact.").

property—must be actually transferred or conveyed to the recipient of the put.[8] IRI supports its understanding of the common usage of "put" with a definition from *Merriam-Webster's Collegiate Dictionary*, arguing that when the word "is used with an object—for example, 'put the keys on the table' or 'put her money into bonds'—the word 'put' is defined as 'to place in a specified position or relationship.'"[9]

---

[8] IRI relies on several cases as examples of real-estate contracts that use the term "put." *See Turboff v. Gertner, Aron & Ledet Invs.*, 840 S.W.2d 603 (Tex. App.—Corpus Christi 1992, writ dism'd); *Doerge v. Nat'l Bank of Commerce*, 482 F. Supp. 802, 804 (N.D. Tex. 1977), *aff'd*, 609 F.2d 1006 (5th Cir. 1979); *Exch. Bank & Trust Co. v. Doerge*, Nos. 41191, 41230, 1980 WL 354907 (Ohio Ct. App. Aug. 28, 1980). These cases lend no aid to the interpretive question in this case. They do not apply the same contractual language at issue in this case or otherwise establish that there is a commonly understood, uniform meaning of the term "put" in the real-estate context that supports IRI's interpretation of the remedies available under the Villas Agreement. *See also U.S. Rest. Props. Operating L.P. v. Motel Enters., Inc.*, 104 S.W.3d 284, 287–88 (Tex. App.—Beaumont 2003, pet. denied) (describing "put option" that operated not as a measure of damages for breach of a purchase and sale agreement, but as a contractual mechanism for the seller of 37 Dairy Queen restaurants in a lease-purchase arrangement to require the buyer of the restaurants to purchase a promissory note in favor of the seller).

[9] IRI also relies on the broader structure the contract's menu of "sole and exclusive remedies" to argue that allowing a recovery on RP West's theory conflicts with section 8.2(i), which authorizes the seller to terminate the agreement and keep the earnest money as liquidated damages. In connection with this "termination" remedy, section 8.2 states that "Seller and Purchaser have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and Seller and Purchaser agree that these sums represent

For its part, RP West contends that the contract unambiguously authorized it to "put" the property to IRI by the act of suing it to recover the contractual purchase price. It reasons that the contract's reference to the seller's "rights of offset" means that the remedy "specifically contemplated a mitigation sale and allowed for an offset of the price received." RP West also points out difficulties with IRI's interpretation of the "put" remedy, which makes it entirely duplicative of the specific performance remedy authorized by section 8.2(iii), and also

---

reasonable compensation to Seller for such breach." *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) ("In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation."). Relying on that contractual language, IRI contends that RP West's interpretation of the "put" remedy functions as a provision for "actual damages," which the parties specifically excluded from consideration due to its difficulty of calculation, and as such was expressly ruled out as a potential remedy, thus reflecting the parties' "allocated risk of damages." We reject this reasoning for at least two reasons. First, common-law "actual damages" for a breach of this contract would have required a determination of the market value of The Villas on the date of IRI's breach, *see, e.g.*, *Barry v. Jackson*, 309 S.W.3d 135, 140 (Tex. App.—Austin 2010, no pet.), and RP West's interpretation of the "put" remedy does not subject the parties to the difficulties of proving market value as of a particular date. *See, e.g.*, *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (market value is the price that would be offered by a willing buyer to a willing seller, when neither is under compulsion to buy or sell). Moreover, IRI presents no authority, and we decline to hold, that by agreeing that a seller may retain earnest money as liquidated damages for the purchaser's breach of a real-estate sale agreement, the parties are thereby prevented from also agreeing to some other alternative formula for determining money damages at the seller's election.

24

suggests a commercially implausible scenario that IRI's breach would be rewarded by requiring RP West to transfer the property to IRI first and then endure the litigation process to try to recover the purchase price later.

First, we reject the suggestion that the complexity of this dispute can be definitively resolved as a matter of law by reference to an ordinary dictionary definition of the word "put." The myriad of potential uses of that word is confirmed by the definition found in *The New Shorter Oxford English Dictionary*, where the definition consumes one entire three-column page, spills over onto parts of two other pages, and illustrates dozens of particularized uses of the word "put." 2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 2425–27 (1993 ed.). Not all of those examples are inconsistent with RP West's interpretation. For example, "put" can be used to mean "cause to get into or be in some place or position expressed or implied." *Id*. at 2425. Used in that sense, "put to" can mean "write (a signature or name) fix (a seal etc.) on a document etc.," *id*., and thus understood could be consistent with RP West's argument that it "put" the property to IRI by the act of filing its suit to recover the purchase price.

Another definition is found in *Black's Law Dictionary*, where the entry for "put" directs the reader to the definition for "put option," defined as "[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." BLACK'S LAW DICTIONARY 1268, 1432 (10th ed.

25

2014); *see also* ROBERT W. HAMILTON, FUNDAMENTALS OF MODERN BUSINESS § 20.2 (1989) (explaining the concepts of put and call options in the context of securities options trading). Considered in isolation, this sense of the word "put" seems to support IRI's argument that a put implies a transfer,[10] but it encounters other difficulties in the context of section 8.2. To the extent it would require a transfer of property as a predicate to a suit to recover damages, it seemingly would place the cart before the horse and subject the aggrieved seller to the risk of further injury by awarding the property to a breaching buyer who ultimately may be unable to pay. This understanding also creates the difficulty of duplicating the function of the specific performance remedy of section 8.2(iii), in tension with the interpretive rule that we strive to harmonize and give effect to all provisions in the contract, so that no provision is rendered meaningless.[11] If we attempt to harmonize the two provisions by assuming that the "put" remedy of section 8.2(ii) means something other than the specific performance remedy authorized by

---

[10]   It also conforms to the use of the term in other cases relied upon by IRI. *See supra* note 8.

[11]   *See In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011). The three identified "sole and exclusive remedies" in section 8.2 are all separated by the word "or," indicating their disjunctive nature. *See, e.g.*, *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944); *Am. Nat'l Ins. Co. v. Wilson State Bank*, 480 S.W.2d 296, 300 (Tex. Civ. App.—Amarillo 1972, no writ).

section 8.2(iii), that something must include some other form of a suit for damages—the provision authorizes the seller to sue the purchaser "for the Purchase Price," allowing for "rights of offset against Purchaser to which Seller shall be entitled at law or in equity." While the reference to the "rights of offset" does not expressly mention mitigation of damages—and we cannot agree with RP West based on text that this reference "specifically contemplated a mitigation sale"—we also cannot exclude that understanding as an unreasonable interpretation as a matter of law.[12]

As the foregoing discussion demonstrates, there are substantial arguments for and against the competing interpretations advanced by the parties. Having considered the well-settled rules of contractual interpretation, we conclude that RP West's interpretation of the "put" remedy is a reasonable one, and it certainly

---

[12] IRI argues that the contract imposed no express duty of mitigation on RP West, but we do not agree that this consideration makes RP West's interpretation unreasonable. The doctrine of mitigation of damages "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts." *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). Under Texas law, a claimant is required "to mitigate damages if it can do so with trifling expense or with reasonable exertions." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999). In a contract suit, amounts that a plaintiff recovered or should have recovered through mitigation of damages are offset against his recovery. *See, e.g.*, *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 278 (Tex. App.—Dallas 2006, no pet.); *Murphy v. Gulf Consol. Servs., Inc.*, 666 S.W.2d 383, 383–84 (Tex. App.—Houston [14th Dist.] 1984, no writ).

cannot be foreclosed solely on the basis of IRI's competing interpretation. Even if we assumed, without deciding, that IRI's interpretation also could be reasonable, that would afford no grounds for relief from the judgment. With two reasonable interpretations, the correct understanding of the "put" remedy would have been a question of fact for the jury, which was resolved in RP West's favor when the jury determined that it exercised the contractual put remedy. Accordingly, the trial court did not err by denying IRI's post-verdict motions which argued that its understanding was the only correct interpretation of the contract.

We therefore overrule IRI's first issue.

## II. IRI's defenses of impossibility, waiver, and estoppel

IRI's second, third, and fourth issues concern its affirmative defenses. In its second and third issues, IRI contends that the trial court erred by denying its motions for directed verdict, to disregard jury findings, and for judgment n.o.v. In its fourth issue, IRI contends that the trial court erred by granting RP West's motion for directed verdict on IRI's estoppel defense and by failing to submit its estoppel defense to the jury.

### A. Impossibility

In its second issue, IRI contends that the trial court erred in denying its motion for directed verdict on impossibility because RP West's sale of The Villas to a third party made it impossible for it to transfer The Villas to IRI. We have

28

already explained that RP West's interpretation of the put remedy was reasonable, was implicitly accepted by the jury, and allowed RP West to mitigate its damages. Under this contractual remedy, RP West was not obligated to hold The Villas until the lawsuit was concluded.

Moreover, impossibility is a defense to a cause of action for breach of contract. *Tractebel Energy Mktg., Inc. v. E. I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 66 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). "'Where . . . a party's performance is made impracticable . . . by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged . . . .'" *Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992) (quoting *Restatement (Second) of Contracts* § 261 (1981)). In this case, there was no factual dispute about the breach of contract: IRI admitted breaching the contract, and it did not argue that its performance was impossible because of the occurrence of an event, the non-occurrence of which was a basic assumption of the parties' agreement. *See id.*

IRI also argued that the trial court erred by improperly submitting its impossibility defense in jury question 3, which stated:

> Was Internacional Realty Inc.'s failure to comply with the Purchase and Sale Agreement as amended by the First Amendment excused by impossibility?

> Impossibility is established if, at the time 2005 RP West, Ltd. was required to perform the Purchase and Sale Agreement as amended by the First Amendment, it was not ready, willing, and able to do so.
>
> Section 9.6 of the Purchase and Sale Agreement provides "Time is of the essences of this Agreement."
>
> Compliance with an agreement must occur within a reasonable time under the circumstances unless the parties agreed that compliance must occur within a specified time and the parties intended compliance within such time to be an essential part of the agreement.
>
> In determining whether the parties intended time of compliance to be an essential part of the agreement, you may consider the nature and purpose of the agreement and the facts and circumstances surrounding its making.

At the charge conference, IRI requested that the following impossibility instruction be submitted to the jury:

> 2005 RP West, Ltd. cannot recover under the Put provision in §8.2(ii) of the Purchase and Sale Agreement if it is impossible to do so. 2005 RP West, Ltd. has a continuing obligation to prove that it is ready, willing and able to convey the Villas to Internacional Realty Inc. These obligations extend to "all times relevant to the contract and thereafter."

The trial judge stated on the record, "I don't like the 'cannot recover' portion of it." The court denied the request.

IRI argues that in order to recover under the "put" remedy, RP West had to demonstrate that it was ready, willing, and able to perform. In *DiGiuseppe v. Lawler*, 269 S.W.3d 588 (Tex. 2008), the Supreme Court of Texas addressed the elements that must be shown to recover under the equitable remedy of specific

30

performance. 269 S.W.3d at 593. Because it is an equitable remedy, ordinarily a party seeking specific performance must show that he has complied with the obligations under the contract and tendered performance. *Id.* at 594. We have already explained that the "put" remedy is not necessarily identical to the remedy of specific performance. We decline to engraft the requirements necessary to recover under this equitable remedy onto the contractual remedy of putting the property to the purchaser and suing for the purchase price. We overrule IRI's second issue.

## B. Waiver

In its third issue, IRI argues that the trial court erred by denying its motion for directed verdict and failing to submit waiver and estoppel to the jury. IRI argues that RP West waived the "put" remedy by informing IRI that it was in default of the Villas Agreement, demanding and accepting the earnest money, telling IRI that it had no enforceable right to buy the property, entering into a sales and marketing agreement with a realtor to seek a third-party buyer, setting a sales price higher than the $21.5 million contract price, negotiating a concession on the realtor's commission, selling The Villas to a third party, and failing to continually communicate with IRI. IRI also relies on financial statements it received from RP West's accountant related to the mezzanine loan that characterized the $215,000 earnest money as proceeds from a terminated contract for project sale.

"Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan*, 111 S.W.3d at 156. Only actions that are inconsistent with an intent to rely on a right can be evidence of waiver. *Id.*

The actions that IRI identifies do not clearly show that RP West intended to waive its contractual "put" remedy. First, the "put" remedy specifically contemplates that the earnest money will be an offset to any recovery won by RP West. Therefore, accepting the earnest money is not inconsistent with election of the "put" remedy. Second, RP West expressly reserved its right to elect a remedy in a January 2008 email from its lawyer to IRI's lawyer. Later, it took actions to mitigate its damages, including entering into a sales and marketing agreement with a realtor, setting a sales price above the contract price, securing a concession on the real-estate commission, and selling The Villas to a third party. We have explained

that RP West was entitled to mitigate damages under the put remedy; therefore these actions consistent with mitigation of damages are not evidence of waiver. As to the financial statements provided to the mezzanine lender, Wilson testified that he did not direct the accountants to characterize the money as proceeds from a terminated contract. Accordingly, the notation indicates no more than the accountant's characterization of the money, and in light of the reservation of rights and other facts does not demonstrate an intent to waive the "put" remedy.

IRI contends that the trial court erred by denying its motion for directed verdict as to waiver because it conclusively proved that RP West impliedly waived the "put" remedy. In the alternative, IRI argues that the trial court erred by not submitting waiver to the jury. Based on our review of the record, we disagree and conclude that there is no evidence that RP West waived its right to elect the put remedy. A trial court errs by submitting to the jury a question that is not supported by the evidence. *Harris Cnty. v. Smith*, 96 S.W.3d 230, 238 (Tex. 2002). Because we have concluded that there was no evidence to support IRI's argument that RP West waived its right to elect the "put" remedy, we hold that the trial court did not err by denying IRI's motion for directed verdict or by refusing to submit to the jury a question on waiver. We overrule IRI's third issue.

**C. Estoppel**

In its fourth issue, IRI contends that the trial court erred by granting RP West a directed verdict on IRI's estoppel defense, and, in the alternative, that the trial court erred by failing to submit IRI's estoppel defense to the jury. Equitable estoppel is an affirmative defense. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 188 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "An affirmative defense does not tend to rebut factual propositions asserted by a plaintiff, but seeks to establish an independent reason why the plaintiff should not recover." *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991). A defendant seeking to avoid judgment under the affirmative defense of equitable estoppel must prove: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

IRI argues that the evidence conclusively shows that RP West made false representations and concealed material facts, and therefore the court should have submitted its equitable estoppel defense to the jury. But all of the actions of which IRI complains occurred after it breached the Villas Agreement in January 2008.

For example, IRI relies on communication from RP West that a majority of the limited partners asked the limited partner to find another buyer, the compiled financial statements that were sent to the mezzanine lender in an attempt to extend the loan after IRI's breach, and RP West's lack of communication during most of 2008. Although IRI argues that it stopped seeking financing based on what it alleges are omissions or representations that RP West would not elect the "put" remedy, RP West's delay of eight months in exercising the put remedy was well within the four-year statute of limitations for breach of contract cases. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (West 2002); *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 315 (Tex. 2006) (per curiam). And none of this evidence establishes an independent reason why RP West should not recover for the earlier breach of contract. *See Gorman*, 811 S.W.2d at 546.

Accordingly, we hold that the trial court did not err by granting RP West's motion for directed verdict on the defense of estoppel or by refusing to submit this to the jury. We overrule the fourth issue.

## III. RP West's choice of remedy

IRI's fifth and sixth issues concern the trial court's rulings and the jury's findings as to which contractual remedy RP West elected to pursue. In its fifth issue, IRI contends that the court erred by denying its motion to disregard jury findings and motion for judgment n.o.v. because, as a matter of law, RP West

35

elected the earnest money remedy as its sole and exclusive remedy for breach of the Villas Agreement. IRI alternatively contends that the jury's answer that RP West did not elect the earnest money remedy was against the great weight and preponderance of the evidence. In its sixth issue, IRI contends that the evidence was both legally and factually insufficient to support the jury's verdict that RP West elected the "put" remedy.

When reviewing a trial court's ruling on a j.n.o.v. based on the party's contention that it is entitled to judgment as a matter of law, we review the court's action de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994); *NETCO, Inc. v. Montemayor*, 352 S.W.3d 733, 738 (Tex. App.—Houston [1st Dist.] 2011, no pet.) We review legal sufficiency challenges in accordance with the *City of Keller* standard, determining whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review factual sufficiency challenges to determine whether "the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Kroger Co. v. Persley*, 261 S.W.3d 316, 319 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

IRI initially argues that by accepting the earnest money and seeking a third-party purchaser for The Villas, RP West elected the first contractual remedy, to

terminate the Villas Agreement and be entitled to the earnest money as liquidated damages. We have already explained that acceptance of the earnest money was consistent with election of the put remedy.

Moreover, the parties modified the earnest-money provision in the amendment pertaining to the Trimarchi earnest money. Specifically, IRI assigned to RP West all of its "right, title and interest in and to the Trimarchi Earnest Money, which assignment shall become effective immediately upon execution of the Trimarchi Contract." The assignment was intended to serve as a replacement of the earnest money deposit otherwise provided for under the Villas Contract. The amendment provided that if the Trimarchi contract were not "executed" by September 21, 2007, IRI would "immediately" redeposit the $215,000 in earnest money. The amendment also provided that the terms of the amendment would control over the other contract terms should a conflict arise.

"The term 'execute' means 'to finish' or 'make complete.'" *Travelers Ins. Co. v. Chicago Bridge & Iron Co.*, 442 S.W.2d 888, 895 (Tex. Civ. App.— Houston [1st Dist.] 1969, writ ref'd n.r.e). Therefore, the "execution of a contract includes the performance of all acts necessary to render it complete as an instrument." *Id.*; *see Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010) (discussing requisites for execution of contract). RP West released the earnest money, in accordance with the amendment, and the

Trimarchi contract was signed before September 21, 2007. IRI does not argue that the Trimarchi contract was not executed before September 21, 2007; rather, it ignores the effect of the amendment on ownership of Trimarchi's forfeited earnest money.

After Trimarchi defaulted on its agreement to purchase The Villas from IRI, the title company released Trimarchi's earnest money to IRI. Caraway testified that IRI was holding the money in lieu of the title company until the date for Trimarchi's closing passed, at which time Caraway believed the money would be IRI's "to do with as we pleased." The plain language of the amendment directly contradicts that. IRI had already assigned to RP West all of its "right, title and interest in and to" the Trimarchi earnest money. Thus without regard to the contractual remedy provisions in the Villas Agreement and in accordance with the amendment, RP West was entitled to the Trimarchi earnest money when Trimarchi defaulted on its contract.

Because RP West was independently entitled to receive the earnest money, its request for and acceptance of the earnest money does not conclusively demonstrate that it elected the "earnest money" remedy in the parties' contract. The evidence at trial showed that RP West repeatedly demanded performance; agreed to extensions of closing to enable IRI to perform; reserved its rights and remedies in writing; stated that it was not waiving any remedy; and asked IRI to

purchase The Villas. We conclude that the evidence would enable reasonable and fair-minded jurors to conclude that RP West elected the "put" remedy. *See City of Keller*, 168 S.W.3d at 827. Having reviewed the record, we likewise conclude that the jury's determination that RP West elected the "put" remedy is not so weak or so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Kroger*, 261 S.W.3d at 319.

We overrule IRI's fifth and sixth issues.

## IV. Damages

In its seventh issue, IRI contends that the evidence is legally and factually insufficient to support the jury's award of $4 million in damages. IRI alternatively contends that the trial court erred by failing to instruct the jury on the correct measure of damages.

In Question No. 4, the jury charge asked:

> What sum of money, if any, paid now in cash, would fairly and reasonably compensate 2005 RP West, Ltd. for its damages, if any, resulting from Internacional Realty, Inc.'s failure to comply with the Purchase and Sale Agreement as amended by the First Amendment.

> Do not add any amount for interest on damages, if any.

The jury answered, "$4,000,000.00."

At trial IRI objected to Jury Question 4 as originally contemplated by the court, which included the following instruction:

> You may consider the following element of damages and none other:

39

The difference between (a) the amount Internacional Realty Inc. agreed to pay for the Villas and (b) the actual sales price 2005 RP West, Ltd. received for the sale of the Villas.

IRI requested that the court delete the language following "and none other" and replace it with:

§ 8.2(ii) "put the Property to the Purchaser and sue Purchaser for the Purchase Price"

At the charge conference, IRI's attorney stated, "What we're proposing is that we change the element of damages to track the contract language exactly with a quote from the contract." The court refused the request. IRI's attorney then objected to the instruction that the court initially proposed including in the charge, stating:

[T]he instruction that is in there does, in fact, track a theory completely unsupported by evidence of damage recovery, but it is not an actual permissible element of damages in this case, and that's why we feel that what is listed in there, which is essentially a rewriting of the exhibit that [RP West's attorney] drew [during trial] that will incorrectly inform the jury of what it should be doing ahead of time in this . . . instruction.

There was no objection or discussion regarding the need for RP West to have proven the market value of The Villas at the time of the breach or for a request for "actual" breach-of-contract damages. The court decided to eliminate the instruction altogether and IRI agreed, stating, "We're in . . . line with that . . . We would just ask that we add 'Do not add any amount for interest on damages, if any,' as it tracks the P.J.C."

On appeal, IRI contends the trial court erred by failing to include any instruction as to the measure of damages. Although IRI made a request and objection pertinent to Question No. 4, the issue that it raises on appeal was not brought to the court's attention during the charge conference. Because IRI agreed with the court and failed to object to the omission of an instruction as to damages or request such an instruction in substantially correct form, this part of issue seven is waived. *See* TEX. R. APP. P. 33.1; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829–30 (Tex. 2012).

In the absence of an objection to the court's charge, we evaluate the sufficiency of the evidence in light of the court's charge as given to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Because the issue raised on appeal—that the damages question submitted to the jury did not ask the jury to determine actual "breach of contract damages"—was not raised in the trial court, we determine the sufficiency of the evidence in light of the court's charge. *See id.* We have already explained that the contractual measure of damages for the "put" remedy differed from "actual" breach-of-contract damages in that it did not require RP West to prove the market value of The Villas at the time of the breach. Rather, the contractual "put" remedy provided for damages in an amount equal to the contract price of The Villas, less any offsets allowed by law and equity. Contrary to IRI's argument that RP West's "sole evidence was counsel's hand-drawn exhibit

prepared at trial," the record contains legally and factually sufficient evidence to support the jury's verdict.

First, Wilson and Caraway both testified that the contract price of The Villas was $21.5 million and the contract itself was entered into evidence. Second, both the contract and the testimony at trial showed that when RP West demanded IRI to forfeit the earnest money, IRI gave RP West $215,000. In addition, the evidence at trial further showed that RP West mitigated its damages by selling The Villas for $16.9 million. Subtracting the earnest money and purchase price, both allowable offsets, from the $21.5 million contract price results in a sum of $4,385,000, which is $385,000 more than the jury awarded. IRI contends that the jury failed to account for $3.8 million in earnings from The Villas that RP West earned between 2008 and 2010. However the evidence was in conflict on that matter, with Wilson testifying that most of the income was used to pay for operating expenses. The jury determines the credibility of the witnesses and the weight to be given their testimony and resolves conflicts in the evidence. *See Kroger*, 261 S.W.3d at 319. Having considered the evidence in this case, we hold that it is both legally and factually sufficient to support the jury's award of $4 million in damages. We overrule IRI's seventh issue.

## V.     Attorney's fees and pre- and post-judgment interest

In its eighth issue, IRI contends that the trial court erred in awarding attorney's fees and pre- and post-judgment interest to RP West. Assuming that it prevails on its other issues, IRI argues that it, not RP West, is entitled to attorney's fees as the prevailing party. As we have explained, the trial court did not err in ruling in favor of RP West. Accordingly, IRI was not and is not the prevailing party and is not entitled to attorney's fees. We overrule this issue.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, concurring.